IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEREMY LOCKETT,

        Plaintiff,

      v.                       Case No. 20C0339

LEBBEUS BROWN, ET AL.,

        Defendants.

## DEFENDANTS' BRIEF IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Jeremy Lockett alleges four prison officials violated his Fourteenth Amendment rights and retaliated against him when they punished him for possessing gang material in 2018. He claims he obtained the gang material to use in a religious lawsuit about his "religion" of Growth and Development. But Defendants knew Growth and Development to be a prohibited security threat group, and they punished Lockett for legitimate reasons. Judgment should be granted for Defendants.

## Statement of Facts

### A. Parties

Lockett is a prisoner who was previously confined to the Wisconsin Secure Program Facility (WSPF). (Defendants' Proposed Findings of Fact[1] ¶ 1.) He identified as a Protestant on Wisconsin Department of Corrections' religious preference forms

---

[1] Hereinafter "DPFOF."

from 2013 until after he filed this lawsuit, at which point he submitted a new form stating he preferred the "religion" of "Growth and Development." (DPFOF ¶ 2.)

Defendant Gary Boughton is the WSPF Warden and has been since March 2014. (DPFOF ¶ 3.) Defendant Lebbeus Brown was a Unit Manager at WSPF at all times relevant, and the Security Threat Groups Coordinator for 13 years. He is now retired. (DPFOF ¶¶ 4-5.)

Defendant Craig Tom is a Captain at WSPF since 2018. In this role, he filled in as a hearing officer for disciplinary hearings, as needed. (DPFOF ¶ 6.) Defendant Thomas Taylor is a Lieutenant at WSPF and was so at times relevant to this case. (DPFOF ¶ 7.)

### B. Growth and Development

This lawsuit is about Growth and Development and the Gangster Disciples. Although members of Growth and Development will claim this is a group of do-gooders, and some may even claim it is a religion, Growth and Development is a cover for the Gangster Disciples gang. (DPFOF ¶ 19.)

The Gangster Disciples began in the 1960's in Chicago, Illinois, when Larry Hoover and David Barksdale united their existing gangs to form the Black Gangster Disciple Nation. (DPFOF ¶ 8.) Hoover took charge of the Gangster Disciples in 1969, after Barksdale was wounded in a shooting. His gang controlled the South Side drug trade in Chicago. (DPFOF ¶ 8.) Hoover was in and out of prison several times in his early 20s for criminal activity. In 1973, Hoover and another Gangster Disciple

member were charged with murdering a drug dealer. Hoover was sentenced to 150 to 200 years in prison and sent to a maximum-security prison in Illinois. (DPFOF ¶ 9.)

In prison, Hoover's power grew. He protected other inmates, who became devotees and new recruits for the Gangster Disciples. (DPFOF ¶ 10.)

In the mid-1980's, Hoover started to discourage violence among his followers. He made education mandatory for Gangster Disciple members and instructed his army to go to school, learn trades and develop talents and skills. (DPFOF ¶ 11.) Along with these changes, Hoover changed the G.D. of "Gangster Disciple" to "Growth and Development." He began receiving positive attention from the outside. Growth and Development created nonprofit organizations that registered voters, a music label that helped needy children, a series of peaceful protests to fight the closing of public programs, and a clothing line. (DPFOF ¶ 12.)

Prison officials, however, were dubious. They saw Hoover's good intentions as a ploy to help his cause with the parole board. Friends and allies on the outside lobbied to get Hoover paroled for his contributions to society. Meanwhile, law enforcement agents insisted that he was finding new ways to expand his criminal ventures. (DPFOF ¶ 13.)

In the late 1980's, Hoover was transferred to a minimum security prison in Illinois where he appeared to be living a luxurious lifestyle with new clothes, expensive jewelry, specially prepared meals and private visitations. Suspicious authorities began wire-tapping Hoover's private meetings and discovered he was running the Gangster Disciple group from within the prison system. Informants

revealed that Hoover's nonprofit organizations were actually fronts for laundering drug money. (DPFOF ¶ 14.)

In 1995, after a five-year undercover investigation by the federal government, Hoover was indicted on drug conspiracy charges. Hoover tried to portray his gang as a "do-gooder" group to help in his own defense strategy when he was on trial for the federal charges. This effort was written about in *The Impact of the Federal Prosecution of the Gangster Disciples*, by George W. Knox, Ph.D. In this report, Dr. Knox described that Hoover "bargained that if he was portrayed as a political prisoner, that he could sway the hearts and minds of a jury to acquit him." However, "[i]t backfired in a very big way, and in retrospect was exactly the kind of thinly disguised and deceitful posturing and megalomaniacal grandstanding that a prosecutor could benefit from." (DPFOF ¶ 15.) The report goes on to describe,

> The idea that Larry Hoover was being prosecuted because he had transformed his gang into a lawful and politically active community organization was the kind of "sham" and "scam" that any person of normal intelligence could quickly see through. Members of the jury simply did not buy the scam that Larry Hoover was being persecuted by the federal government because he was a major political figure in the African-American community. It was a bizarre and counter-productive defense to the kind of criminal charges he was facing.

(DPFOF ¶ 16.)

In 1997, Hoover was found guilty on all charges, and sentenced to six life sentences. He is currently serving his sentence in a supermax in Colorado. Hoover remains the leader (Chairman) of the Gangster Disciples. (DPFOF ¶ 17.)

The Gangster Disciples remain incredibly active in cities across America and maintain a significant presence in the U.S. prison system. The Gangster Disciples is structured like a corporation and led by a chairman of the board. Its main source of

income is the street-level distribution of cocaine, crack cocaine, marijuana, and heroin. The gang also is involved in other criminal activity, including assault, auto theft, firearms violations, fraud, homicide, the operation of prostitution rings, and money laundering. (DPFOF ¶ 18.)

Although members continue to try and conceal the true nature of Gangster Disciples by using the Growth and Development façade, the two organizations are one in the same. Growth and Development was and is a façade used to funnel drug profits of Gangster Disciples. Growth and Development and Gangster Disciples are both considered security threat groups by Wisconsin prison officials. (DPFOF ¶ 19.)

## C. Lockett's Conduct Report

Lockett filed this lawsuit after being caught participating in Growth and Development activity. He and other prisoners possessed and were circulating Growth and Development recruitment material. The circumstances are described in a conduct report completed by Defendant Brown on September 28, 2018.

The conduct report describes that inmate Andre Tinnon handed out of his cell trap what appeared to be a legal envelope to Officer Brown (not Defendant Brown). Tinnon asked the envelope to be returned to inmate Zachary Hayes. Officer Brown scanned the material quickly and saw the word "Gangster Disciples." Officer Brown gave it to Sergeant Henneman, who turned it over to a supervisor for review. The material then went to Defendant Brown to review as the Security Threat Group Coordinator at WSPF. (DPFOF ¶ 20.)

Defendant Brown saw the envelope was from the Western District Court to Hayes. The materials included: 1) Rod Emery's *The Blueprint: From Gangster Disciple to Growth and Development* (Copyright 1996); and 2) Larry Hoover's *Blueprint of the New Concept*, and other papers. On the top of the papers was a docket stamp (#23-1) from a civil case inmate Terrence Prude filed in the Western District of Wisconsin, *Prude v. Meli*, 17-cv-336. The materials had been mailed to the court from a Milwaukee zip code although the envelope's return address showed Prude's WSPF address in Boscobel, Wisconsin. The materials included a letter to the court asking the court to take judicial notice of them in Prude's lawsuit. (DPFOF ¶ 21.)

Terrence Prude is a known leader among the Gangster Disciples in the Wisconsin Department of Corrections. (DPFOF ¶ 22.)

Brown described in the conduct report that the *Blueprint of the New Concept* has the "rules, creeds, violation for misconduct by the gang members and the structure of the Gangster Disciple in the DOC." He noted that it also has a picture of the leader (Chairman) Larry Hoover. (DPFOF ¶ 23.)

Brown wrote in the conduct report that he had reviewed the docket in Prude's civil lawsuit further. He found that on July 16, 2018, Prude requested a copy of Docket #23 from the court. On July 30, 2018, Lockett requested a copy of Docket #23. On August 9, 2018, inmate Hayes requested a copy of Docket #23. Brown reviewed the requests and saw they were similar if not exact to Prude's writing in all three requests. (DPFOF ¶ 24.)

Brown also described that staff completed cell searches of the inmates. Tinnon handed out a complete copy of Emery's *Blueprint*. Hayes possessed part of Hoover's *Blueprint*. Locket possessed both sets of documents. When Prude was asked for the documents, he ripped them into small pieces. (DPFOF ¶ 25.)

Brown concluded that Prude used his court case to get gang related material into the prison to help structure and recruit members into the Gangster Disciples. The inmates were caught passing the materials. Brown believed Prude destroyed his copies so staff could not verify if he had passed his copies. (DPFOF ¶ 26.)

The conduct report described some background of the Gangster Disciples and the true nature of Growth and Development. Brown wrote, "Hoover attempted to change the perception of the Gangster Disciple by calling the gang Growth and Development and a book was copyrighted in 1996 which includes From Gangster Disciples to 'the blueprint' Growth and Development, the gang continued in the same criminal activities." (DPFOF ¶ 27.) Brown wrote about parallels between Gangster Disciples and Growth and Development, such as "The Gangster Disciple uses the 6 point star with each point with a name. The 6 points stand for Love, Life, Loyalty, Knowledge, Wisdom, and understanding the same as Growth and Development 6 principles." He also wrote, "In the Blueprint of the New Concept the front page has the 6 point star and the leader Larry Hoover." (DPFOF ¶ 28.)

Brown also noted additional pertinent details about the materials. He wrote, "On page 7 [of Hoover's *Blueprint*] are the sixteen laws '1 silence + secrecy: No member shall give information or discuss any matter concerning any member or

7

function of this organization with anyone who is not a standing member." Brown noted that Page 8 of Hoover's *Blueprint* has the Seventeen Laws, and Number 12 states, "Aid and assist: all members shall aid and assist one another in all Righteous endeavors." Page 49 of the materials lists the institution structure and duties of the ranks of the Gangster Disciples. (DPFOF ¶ 29.) There are also various recitations in the materials which would be used to build loyalty and allegiance to Gangster Disciples. (DPFOF ¶ 30.)

Brown noted that, "In the Wisconsin Department of Corrections, both Gangster Disciples and Growth and Development are considered a Security Threat Group. The GD in prison continues to violate the DOC rules such as fighting, gambling, extortion, and sanction of their own member which include fines to physical confrontation. This makes Gangster Disciples a high risk to the safety of the Institution, staff, and other inmates." (DPFOF ¶ 31.)

On September 28, 2018, Brown completed conduct report #3141599, charging Lockett with Group Resistance and Petitions and Possession of Contraband – Miscellaneous. (DPFOF ¶ 32.) In the conduct report, Brown concluded based on his training and experience, that the inmates were "in possession of gang material or actively participating and using the material to recruit . . . other inmates into the Security Threat Group, Gangster Disciples." (DPFOF ¶ 32.)

Sergeant Lange reviewed the evidence on October 1, 2018, as a Security Threat Groups Specialist and agreed with Brown's determination that the activity was associated with Security Threat Group Activities. Circulation of the Blueprints in the

institutions could be used for recruitment purposes and for teaching inmates about the Gangster Disciples. The materials include information about collection of dues, house policies, including consequences, chain of command, and a membership application.  (DPFOF ¶ 33.)

### D. Disciplinary Hearing

On November 16, 2018, Lockett had a disciplinary hearing regarding the conduct report. Defendant Tom served as the hearing officer. (DPFOF ¶ 38.)

Lockett gave a statement arguing that he purchased the "legal document" to "launch a lawsuit against Brown for harassment against my religion." He also said Prude asked him to draft an open records request to the clerk to buy the documents from Prude's case so Prude could assist Lockett in a lawsuit. Lockett described that he filled out a disbursement for $11.60 and sent it to the prison's business office to mail a check to the court. The business office processed the request and took the money out of his account. The court clerk received the funds and mailed him the documents. Lockett described the prison staff then brought the "legal mail" to his cell front and opened it in front of him, scanned it for contraband, and gave him the "legal materials." (DPFOF ¶ 39.) Lockett submitted his property receipt as evidence, showing staff had allowed him to possess the materials he ordered from the court docket. (DPFOF ¶ 40.)

Lockett raised numerous defenses at the hearing. He argued his Fourteenth Amendment rights were violated by failing to provide him notice of the prohibited conduct because there is "nothing [in] DOC 303.24 that indicates directly or indirectly

that the actions listed above . . . were prohibited." (DPFOF ¶ 41.) Lockett argued his First Amendment rights were violated by confiscating his documents, because the document was also his "religion teachings," and does not raise any legitimate security concerns. (DPFOF ¶ 42.) And Lockett argued he was being punished for obtaining documents from open records. (DPFOF ¶ 43.)

Lockett requested one witness for the hearing, Terrence Prude. Prude testified at the hearing. Prude confirmed the material came from a pending case of his. Prude claimed he notified Lockett about the material so that Lockett could file a religious lawsuit in court. Prude admitted to helping Lockett request the documents by writing the open records request. Lockett asked Prude if the materials were "under teachings of our religion" and Prude answered "Yes." (DPFOF ¶ 46.)

Defendant Craig Tom considered the evidence, including the conduct report statement, the Growth and Development materials, and Lockett and Prude's testimony. (DPFOF ¶ 47.) Tom decided it was more likely than not that Lockett committed the alleged violations of Wis. Admin. Code §§ 303.24 and 303.47. His decision largely reiterated the statement in the conduct report. He concluded Lockett's testimony was self-serving in an attempt to minimize his responsibility for his actions. He found Prude's testimony was not credible, as it "appeared to be rehearsed." Tom noted, "Inmates try and hide/conceal gang literature in legal correspondence and under religion." Tom ordered a disposition of 120 days disciplinary separation. (DPFOF ¶¶ 48-49.)

Lockett appealed the decision. Deputy Warden Jaeger affirmed the finding of guilt and disposition. (DPFOF ¶ 50.)

Neither Defendant Boughton nor Defendant Taylor had anything do with the above proceedings. (DPFOF ¶¶ 51, 52.)

## Standard of Review

Under Federal Rules of Civil Procedures 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Moreover, more than mere conclusory allegations are required to defeat a motion for summary judgment. *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996). In order for a party "to avoid summary judgment that party must supply evidence sufficient to allow a jury to render a verdict in his favor." *Williams v. Ramos*, 71 F.3d 1246, 1248 (7th Cir. 1995).

## Argument

### I. Boughton and Taylor should be dismissed for lack of personal involvement.

As a preliminary matter, Defendants Boughton and Taylor should be dismissed for lack of personal involvement. "[I]n order to recover damages against a state actor under § 1983, a plaintiff must show the actor was 'personally responsible for the constitutional deprivation.'" *Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003) (quoting *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 614 (7th Cir. 2002)). It is well settled that "[s]ection 1983 makes public employees liable 'for their own misdeeds but not for anyone else's.'" *Shabazz v. Seresee*, No. 15-CV-120, 2015 WL 3936913, *3 (E.D. Wis. June 26, 2015) (quoting *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009)).

Taylor was not involved in any way with Lockett's conduct report. He was the hearing officer for Terrence Prude's conduct report, but Prude is no longer a Plaintiff in this lawsuit. (DPFOF ¶ 52.)

Meanwhile, Boughton was named as a Defendant based on his alleged involvement in deciding Lockett's appeal of his conduct report. However, Boughton was not responsible for processing Lockett's appeal. (DPFOF ¶ 51.) Deputy Warden Jaeger handled this appeal and Boughton had no involvement in it. Therefore, Boughton should dismissed for lack of personal involvement.

Boughton and Taylor had no involvement in disciplining Lockett. They should be dismissed.

## II.   Lockett's due process claims fail because there was "some evidence" of his guilt.

The Court allowed Lockett to proceed on due process claims against Taylor, Tom, and Boughton, based on Lockett's allegation that "defendants Taylor and Tom convicted him and Boughton affirmed the conviction without even 'some evidence' of guilt." (Dkt. 14:3-4.) But Lockett's summary judgment motion seeks judgment under a different due process theory – that he had no notice that his conduct was prohibited. Under either theory, the due process claim should be dismissed.

### A.   Overview of Due Process Law

A prisoner challenging the process he was afforded in a prison disciplinary proceeding must [show] two [things]: (1) he has a liberty or property interest that the state has interfered with; and (2) the procedures he was afforded upon that deprivation were constitutionally deficient." *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007).

Defendants concede for purposes of summary judgment that Lockett had a liberty interest in avoiding transfer to disciplinary separation. However, he was still only entitled to minimal process. A prisoner facing transfer to disciplinary separation is, at most, entitled to "informal, nonadversarial due process.'" *See Terry v. Stolworthy*, 2016 WL 6393497, at *2 (7th Cir. Oct. 28, 2016); *Harris v. Wall*, No. 14-cv-047-wmc, 2015 WL 5009865, at *7 (W.D. Wis. Aug. 20, 2015) (citing *Westefer v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012); *see also Peete v. Thomas, et al.*, 13-c-587 at pp.14-15 (E.D. Wis. April 28, 2014); *Wilson v. Dittman, et al.*, No. 15-cv-466-wmc at p.5 (W.D. Wis. September 28, 2016).

Lockett's due process rights were satisfied if he received:

1) "Some notice" of the reasons for the inmate's placement;
2) Enough time to "prepare adequately" for the hearing; and
3) An "opportunity to present [his] views" to a neutral decisionmaker."

*Harris*, 2015 WL 5009865, at *7 (citing *Westefer*, 682 F.3d at 684-85).

Lockett also had a due process right for the decision to be supported by "some evidence." *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999). The "some evidence" standard is "less exacting than the preponderance of the evidence standard" and only requires the decision "not be arbitrary or without support in the record." *Id*.

### B.   There was sufficient evidence to find Lockett guilty.

First, as to the sufficiency of the evidence theory which Lockett was allowed to proceed under, there was plenty of evidence to find him guilty at the disciplinary hearing. Lockett would have to prove there was virtually no evidence linking him to the charge to prevail on a due process claim challenging the sufficiency of the evidence. *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985). Here, the evidence in support of the guilty finding included:

- the docket sheet for Prude's civil lawsuit, case 17-cv-336;

- the envelope from the third party who mailed material to the court with the UPSP tracking number;

- Prude's request for Docket #23 attachments #1 and #2 filed on June 27, 2018;

- Lockett's request for Docket #23 (including attachments #1 and #2) dated July 25, 2018;

- inmate Hayes Request for Docket #23 (including attachments #1 and #2) dated August 6, 2018;

- copy of Docket #23 attachments #1 and #2;

- the papers obtained from Prude, Hayes, and Lockett during the cell search;

- and the statement in the conduct report by Defendant Brown, who has extensive security threat group knowledge, including knowledge of the specific gang material at issue and information as to its origins.

This is more than enough evidence to meet the low threshold of "some evidence" to find Lockett guilty of possession of contraband and participation in group resistance and petitions (gang activity).

Lockett would have liked Tom to give his and Prude's testimony more weight. (Pl's Br. At 3.) Tom discounted Prude's testimony because it seemed rehearsed, and discounted Lockett's testimony because it was self-serving. As the hearing officer, it was Tom's prerogative to determine credibility and weigh the evidence. *See Nespor v. O'Brien*, 9 F. App'x 507, 510, 2001 WL 502004, at *2 (7th Cir. 2001); *McPherson v. McBride*, 188 F.3d 784, 786 (7th Cir. 1999).

Lockett relies on caselaw specific to summary judgment motions to argue Tom's credibility determinations were inappropriate. (Pl' Br. At 4-5.) Namely, the Seventh Circuit has said that it is a "misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion." *Widmar v. Sun Chemical Corp.* 772 F.3d 457, 460 (7th Cir. 2014). The court elaborated that a self-serving affidavit may be "an acceptable method for a . . . party to present evidence

of disputed material facts" if "the evidence meets the usual requirements for evidence presented on summary judgment." *Id*. at 460. This means parties should not argue during summary judgment briefing that a witness's declaration should be disregarded because it self-serving. Indeed, summary judgment is not the place for credibility determinations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

However, the Seventh Circuit ruling does not preclude a hearing officer who is viewing live testimony from discounting testimony that seems rehearsed or self-serving. In the he-said/he-said dispute before Tom, he had to decide credibility and weigh the evidence based on something. His determination that the conduct report writer was more credible than Lockett and Prude was reasonable and should not be disturbed by this Court. *See Nespor*, 9 F. App'x at 510.

In any event, regardless of how he analyzed Lockett and Prude's testimony, Tom's decision was based on ample evidence. Lockett's due process claims should be dismissed.

## C. Lockett was not allowed to proceed on a claim about notice.

As to the main due process theory Lockett argued in his summary judgment motion – that he had no notice of the prohibited conduct – this should be disregarded because he was not allowed to proceed under such a theory. The Court framed Lockett's due process claim as a sufficiency of the evidence claim:

> . . . I take [Lockett] to be saying that defendants Taylor and Tom convicted him and that defendant Boughton affirmed the conviction without even 'some evidence' of Lockett's guilt. So I'll allow Lockett to proceed on due process claims against these defendants.
>
> But I warn Lockett that the 'some evidence' threshold is quite low and I am aware from previous cases that some prison officials believe that "Growth

> and Development" is a term used to mask gang membership. Lockett says that Growth and Development is 'registered' as a religion, so I will infer at screening that Lockett is generally allowed to participate in activities under a religion of that title. But to succeed on his claims in this case, Lockett will have to provide evidence showing that defendants did not punish him for legitimate prison reasons.

(Dkt. 14:3-4.)

"[T]he screening order limits the scope of [a] case." *Werner v. Hamblin*, No. 12-C-0096, 2013 WL 788076, *2 (E.D. Wis. Mar. 1, 2013) (unpublished). Accordingly, a "plaintiff cannot raise a claim for the first time in a summary judgment brief." *Burnett v. Wall*, 15-cv-488-bbc, 2016 WL 6956664, *1 (W.D. Wis. Nov. 28, 2016) (unpublished) (citing *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (citation omitted))). Courts routinely (and properly) reject claims outside those permitted by a screening order. *See, e.g., Stechauner v. Murphy*, 17-cv-221-jdp, 2019 WL 1332877, *1 (W.D. Wis. Mar. 25, 2019) (unpublished).

If Lockett had meant to proceed on a claim that he had no notice of the prohibited conduct, he could have moved to reconsider the screening order. He has not done so. The Court should deny Lockett's summary judgment motion as to this theory and dismiss his due process claims.

### D. Lockett did not exhaust this due process theory.

To the extent the Court opts to let Lockett's notice theory proceed, this claim should be dismissed on exhaustion grounds because Lockett has not filed any inmate complaint about the conduct report. Defendants did not raise an exhaustion defense any earlier because the screening order allowed only a sufficiency of the evidence

17

claim to proceed. As described in Defendant's Motion for Leave to File Untimely Motion for Partial Summary Judgment on Exhaustion Grounds, the inmate complaint review system is not an available remedy with respect to challenges to the sufficiency of the evidence because the warden's decision on sufficiency of the evidence is final. Wis. Admin. Code § DOC 303.82(4). Thus, Defendants did not believe there was cause for filing a dismissal motion on exhaustion grounds.

However, had Defendants realized Lockett was allowed to proceed on a lack of notice theory, Defendants would have sought dismissal of the claim on the basis that Lockett filed no inmate complaints about lack of notice. Lack of notice is a procedural issue that could have been raised through the inmate complaint review system. *See* §§ DOC 303.82(4); 310.06(2).  If this notice claim is to be considered, the Court should consider Defendants' late argument as to Lockett's failure to exhaust this claim and dismiss the claim on exhaustion grounds.

## 1. Inmates must exhaust their administrative remedies before bringing a lawsuit.

The Prison Litigation Reform Act of 1995 ("PLRA") requires inmates to exhaust their available administrative remedies before bringing a 42 U.S.C. § 1983 action with respect to prison conditions. The relevant section of the PLRA, 42 U.S.C. § 1997e(a), reads as follows:

> **Applicability of administrative remedies.**  No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  Congress defines "prison conditions" broadly.

> [T]he term 'civil action with respect to prison conditions' means any civil proceeding arising under Federal law with respect to the conditions of the confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison.

18 U.S.C. § 3626(g)(2).

The PLRA exhaustion rule is "comprehensive" and "very broad." *Smith v. Zachary*, 255 F.3d 446, 451-52 (7th Cir. 2001). There is no futility exception to the exhaustion requirement. *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 537 (7th Cir. 1999). "No one can know whether administrative requests will be futile; the only way to find out is to try." *Id.* at 536. Nor is there a substantial compliance exception; a good faith attempt to exhaust is not enough. *Zachary*, 255 F.3d at 452. Furthermore, exhaustion is required no matter what relief the plaintiff seeks. *Booth v. Churner*, 532 U.S. 731, 734, (2001).

There are several important policy considerations behind the PLRA exhaustion rule. Administrative exhaustion restricts frivolous claims, gives prison officials the opportunity to address a situation internally, develops the factual record, and reduces the scope of litigation. *Zachary*, 255 F.3d at 450-51. "The statute embodies a firm congressional will that keeps with a bedrock principle of our jurisprudence: 'Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" *McCoy v. Gilbert*, 270 F.3d 503, 509-10 (7th Cir. 2001) (quoting *Thomas v. Ramos*, 130 F.3d 754, 759 (7th Cir. 1997) (citations omitted)).

In order to protect the goals of the PLRA exhaustion requirement, a plaintiff must exhaust all available administrative remedies before commencing an action. "The exhaustion requirement applies whenever there is some administrative process remaining at the prisoner's disposal." *McCoy*, 270 F.3d at 510. Thus, "a case filed before exhaustion has been accomplished must be dismissed." *Perez*, 182 F.3d at 537.

### 2. Wisconsin prisoners exhaust their administrative remedies by appealing conduct reports and then utilizing the Inmate Complaint Review System.

In Wisconsin, to exhaust issues related to a conduct report, an inmate must first raise the issue at the disciplinary hearing and again on appeal to the warden. *See* Wis. Admin. Code § DOC 303.82(1); *Tonn v. Meisner*, No. 14-CV-481-JDP, 2015 WL 8207513, at *3 (W.D. Wis. Dec. 7, 2015), *aff'd*, 669 F. App'x 800, (7th Cir. 2016); *Walker v. Keller*, No. 13-CV-342-JDP, 2014 WL 3845701, at *4 (W.D. Wis. Aug. 5, 2014). The warden's decision is final with respect to sufficiency of the evidence. Wis. Admin. Code § DOC 303.82(4).

However, any alleged procedural deficiencies can then be pursued through the Inmate Complaint Review System (ICRS) outlined in Wis. Admin. Code Ch. DOC 310. *See* Wis. Admin. Code §§ DOC 310.05, 310.06(2). The ICRS can also be used to raise "issues regarding rules, living conditions, or employee actions that personally affect the inmate or institution environment . . ." Wis. Admin. Code § DOC 310.06(1).

The procedure begins with an inmate filing an offender complaint (DOC-400 form) with the ICE. Wis. Admin. Code § DOC 310.07. This must be done within 14 calendar days of the event giving rise to the complaint. Wis. Admin. Code § DOC

310.07(2). The offender complaint must clearly identify the issue that the inmate seeks to raise. Wis. Admin. Code § DOC 310.07(5).

The ICE may reject a complaint for any reason listed in Wis. Admin. Code § DOC 310.10(6). The inmate may appeal the rejected complaint to the appropriate reviewing authority within ten days, and the reviewing authority would review the basis for the rejection of the complaint. *See* Wis. Admin. Code § DOC 310.10(10). If the offender complaint is not rejected, the ICE makes a recommendation on the complaint to the reviewing authority. Wis. Admin. Code § DOC 310.10(12). The offender complaint is then decided by the appropriate reviewing authority whose decision (if it is adverse to the inmate) can be appealed to the Corrections Complaint Examiner (CCE) within fourteen days. Wis. Admin. Code §§ DOC 310.11, 310.12(1). The CCE then makes a recommendation to the Corrections Secretary, who takes final action. Wis. Admin. Code §§ DOC 310.12(9); 310.13(3).

The failure to properly complete each step in the ICRS grievance procedure constitutes failure to exhaust available administrative remedies. *Pozo v. McCaughtry,* 286 F.3d 1022, 1025 (7th Cir. 2002).

### 3. Lockett did not exhaust the due process claim he seeks to bring here.

Lockett's summary judgment motion alleges he did not have sufficient notice that his conduct was prohibited. This procedural claim could have been raised through ICRS after he received a decision on his conduct report appeal. *See* Wis. Admin. Code §§ DOC 303.82(4); 310.06(2). Lockett did not file any inmate complaints about the conduct report or disciplinary hearing after receiving the decision on his

21

appeal. (DPFOF ¶ 53.) Therefore, Lockett did not exhaust the due process claim he seeks to raise in this lawsuit. The claim must be dismissed on this basis.

### E. The due process claim about notice fails on the merits.

In addition to not being exhausted, Lockett's notice claim fails on the merits. In the prison context, regulations must be sufficiently definite to give prisoners of ordinary intelligence reasonable notice of what conduct is prohibited. *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir.1987). The prohibition on group petitions gave Lockett sufficient notice that he was not allowed to possess security threat group recruitment material.

Pursuant to Wis. Admin. Code § DOC 303.24, "Group resistance and petitions,"

An inmate who does any of the following is guilty of group resistance and petitions:

(1) Participates in any group activity which is not approved by the warden or is contrary to provisions of this chapter.
(2) Joins in or solicits another to join in any group petition or statement. The following activities are not prohibited:
     (a) Authorized activity by groups approved by the warden.
     (b) Group petitions to the courts.
     (c) Complaints properly prepared under ch. DOC 310.
(3) Participates in any activity associated with any security threat group or possesses any written materials, symbols or symbolism related to a security threat group.

The material purchased by Lockett fits squarely within the prohibition on possessing written materials related to a security threat group. *See* Wis. Stat. § DOC 303.24(3). The material expansively discusses the organization and practice of a security threat group. It includes details on organizational structure, rules, creed, etc. It includes a membership application for the gang. (DPFOF ¶ 23.)

22

Lockett argues he had no way of knowing the material was disallowed because he was able to purchase them, he intended it to be used as legal materials, and it constituted religious materials. He cites to various provisions which permit him to possess legal and religious material.

However, any reasonable person would understand that one cannot circumvent the prohibition on security threat group material by simply labeling it religious or legal. Lockett's assertion that he believed he could do so is disingenuous. Even if staff mistakenly failed to recognize what Lockett was trying to order, this does not mean he lacked notice of the prohibition on possessing security threat group material.

Lockett also argues that Brown told him the material was allowed. This is untrue. Brown would not tell an inmate he was allowed to possess Security Threat Group material. (DPFOF ¶ 63.) But to the extent this is disputed, this is not a material dispute. The code provision was clear that inmates cannot possess security threat group material. If Lockett believed he had a religious right to possess the material despite it being prohibited gang material, he could have submitted a request to his chaplain to obtain permission to possess new religious property. (DPFOF ¶ 57.) Whatever conversation Lockett had with Brown, Lockett had notice under the DOC administrative code that he cannot possess Growth and Development recruitment materials.

The due process claims should be dismissed.

**III.    Locket's retaliation claim fails because his speech was not constitutionally protected and he was punished for legitimate reasons.**

Lockett was allowed to proceed on a retaliation claim against Taylor and Tom for convicting him, and Boughton for affirming the conviction based on his claim that he was placed in long-term segregation because of his protected activity (preparing a lawsuit). (Dkt. 14:4.) These claims fail because Lockett's speech was not protected by the First Amendment; the conduct report was not motivated by any protected speech; and the conduct report was issued for legitimate reasons.

**A.    Overview of Retaliation Law**

"To prevail on a First Amendment retaliation claim, [Lockett] must show [by a preponderance of the evidence] that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (citation omitted). "A motivating factor is a factor that weighs in the defendant's decision to take the action complained of—in other words, it is a consideration present to his mind that favors, that pushes him toward, the action." *Hasan v. U.S. Dep't of Labor,* 400 F.3d 1001, 1006 (7th Cir. 2005).

Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendants to prove by a preponderance of the evidence that the same actions would have occurred even in the absence of the protected conduct. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Although it is easy to state a retaliation claim, *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir. 2002), the burden of proving the claim is heavy, *Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996). In discussing prison retaliation claims, the Fourth Circuit noted, "[i]n the prison context, we treat such claims with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citation omitted). It has further been stated "that the retaliation inquiry should be undertaken in light of the general tenor of *Sandin* [*v. Conner,* 515 U.S. 472 (1995)], which 'specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management." *Babcock,* 102 F.3d at 275 (citation omitted).

**B.     The underlying speech was not protected.**

Although Lockett claims he needed the material for a religious lawsuit, the documents at issue are security threat group material, and are strictly prohibited. The retaliation claims should be dismissed because Lockett's possession of gang material is not protected activity.

"The question of whether [the] speech is protected is governed by the standard established in *Turner v. Safley*, 482 U.S. 78, 89 (1987), under which a prison regulation that impinges on prisoners' constitutional rights is valid if 'reasonably related to legitimate penological interests." *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). The material possessed by Lockett was reasonably deemed to constitute a security concern which warranted a conduct report.

In determining whether government conduct is reasonably related to a legitimate penological interest, the court considers four factors: (1) whether a valid, rational connection exists between the individual's action and a legitimate government interest; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) whether accommodation of the asserted constitutional right would have a negative impact on guards, other inmates, and the allocation of prison resources; and (4) whether obvious, easy alternatives exist as evidence that the action is not reasonable. *Tarpley v. Allen Cty., Indiana,* 312 F.3d 895, 898 (2002) (citing *Turner,* 482 U.S. at 89-91).

The burden is not on Defendants to prove the validity of their actions; rather it falls to Lockett to disprove it. *Woods v. Comm'r of the Ind. Dep't of Corr.,* 652 F.3d 745, 748 (7th Cir. 2011). This, he cannot do. His retaliation claims should be dismissed.

### 1.    Punishing Lockett for possession of gang material was rationally related to a legitimate government interest.

The prohibition against possessing Growth and Development recruitment materials is rationally related to legitimate security concerns. Prison security is a compelling state interest, and "deference is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 725, n.13 (2005).

Punishing Lockett for possession of gang material is rationally related to Corrections' security interest in suppressing gang activity. Security threat groups play a role in many of the riot situations, criminal activity, drug use, and violence that takes place in the institutions. Gang activity is detrimental to the individual

26

inmates and their rehabilitation efforts, as it makes some inmates feel unsafe in a prison environment, and some are physically endangered given the presence of rival groups. (DPFOF ¶ 35.) Recruitment efforts for gangs are common in prison. Gangs often undermine prison authority and take an oppositional stance against rules and prison administration. Members use their contacts on the outside to assist in introducing contraband in the facilities. High-ranking gang leaders have successfully run these criminal enterprises within institution walls. (DPFOF ¶¶ 36-37.) For these reasons and more, it is imperative that Corrections staff try to monitor and prevent the spread of security threat group activity in order to maintain a safe and secure environment for the inmates, staff, visitors, and the community. (DPFOF ¶ 34.)

Lockett argues Growth and Development is his religion, but "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." *Cutter*, 544 U.S. at 725, n.13. Here, Brown and Tom knew these materials were not religious doctrine, they were gang material. (DPFOF ¶ 48.) Furthermore, at the time Lockett obtained the material, he had not even listed "Growth and Development" as his religious preference on Corrections' religious preference form. Lockett only updated his preference from Protestant to Growth and Development after filing this lawsuit. (DPFOF ¶ 2.) He is now trying to use his alleged 'religion' to protect him from punishment for possession of gang material, but Brown appropriately saw through this and issued a conduct report for possession of the material. Likewise, Tom appropriately found Lockett guilty of possessing gang material based on the evidence before him.

Lockett also claims he was obtaining the material to file a religion lawsuit. He claims Brown even authorized him to purchase the material. Setting aside the absurdity of his claim that Brown authorized him to purchase security threat group material, this is not material to whether possession of the documents was protected by the First Amendment. Even if Lockett *did* intend to file a lawsuit to gain the right to practice Growth and Development as a religion and to possess Growth and Development materials, he did not go about it appropriately.

If an inmate wants to possess religious material that is not otherwise allowed, he should not do so by getting permission from the unit manager. Rather, he should submit a DOC-2075 Request for New Religious Practice form to the chaplain. The form then goes through many steps for consideration and ultimate approval or denial. Along the way, people with specialized knowledge, experience, and expertise review the request, consider options for accommodation, consult with religious advisors and security personnel, and advise the facility Warden based upon the totality of available information. (DPFOF ¶¶ 57-59.)

If the request is denied, an inmate can file a complaint about it, and ultimately file a lawsuit if he chooses. (DPFOF ¶ 61.)

Inmates have submitted DOC-2075s seeking various accommodations related to Growth and Development and the requests have been reviewed and decided upon. Lockett has never submitted any DOC-2075.  (DPFOF ¶ 62.)

The First Amendment does not protect Lockett's attempt to order contraband with the purported plan of later filing a lawsuit. Ordering contraband to file a lawsuit

is inconsistent with legitimate penological interests. It results in the situation which occurred here, in which Lockett and other inmates were caught with security threat group material. Staff had to invest time and resources into investigating the source and reason for the material. They had to write conduct reports and bring inmates to disciplinary hearings. Meanwhile, the material may have been passed to other inmates, allowing gang activity to grow and threatening the security of the institution.

Lockett choice to order contraband is comparable to the inmate's choice in *Watkins v. Kasper*, to directly confront the librarian. Watkins worked in the library and had various criticisms he wanted to share with the librarian, Kasper. Rather than file a written complaint, he chose to openly criticize the librarian's directives during a meeting in front of other law clerks. Watkins may have had a right to criticize Kasper, but according to the Seventh Circuit, "Watkins could have taken the less disruptive approach of filing a written complaint." *Id*. at 797. "By openly challenging Kasper's directives in front of other prisoner law clerks, Watkins impeded her authority and her ability to implement library policy." *Id.*

Here, Lockett may have had the right to file a religious lawsuit, but he should have taken the approach of following the policies in place to request new religious material. If that request was denied, Lockett could file a written grievance and then proceed to a lawsuit if he wanted. (DPFOF ¶ 22.) He should not have just ordered contraband.

29

Issuing a conduct report and finding Lockett guilty of possession of security threat group material was rationally related to legitimate penological interests.

### 2. The remaining *Turner* factors weigh in Defendants' favor as well.

The "first [*Turner*] factor weighs particularly heavily in the balance and is often viewed as a 'threshold' factor that can be dispositive for either party." *Jones v. Russell*, 149 F. Supp. 3d 1095, 1100 (W.D. Wis. 2015) (citations omitted). It is dispositive here, and additional analyses is not required. Nevertheless, the other factors weigh in Defendants' favor as well.

Regarding the second *Turner* factor, Lockett has alternative means of exercising the right in question. As described above, if he believed he needed to possess the material for his religion, or for a religion lawsuit, he could have filed a DOC-2075 to request the materials. If the materials were denied, and he could file a complaint about the denial, he then would have exhausted his administrative remedies and could file a lawsuit about his desire to exercise the religion. Lockett's alleged attempt to receive approval from Brown was not the appropriate way to access contraband to use in a lawsuit.

The third *Turner* factor weighs in Defendants' favor because accommodation of the asserted right would have a negative impact on guards, other inmates, and the allocation of prison resources. Inmates frequently use religious services and literature, as well as legal mail, to cover up security threat group activity. (DPFOF ¶ 44.) Inmates cannot be allowed to possess security threat group material by claiming it is religious material needed for lawsuits. This would be an easy way to

circumvent the prohibition on gang material. Staff need to be able to suppress gang activity in prison, otherwise there will undoubtedly be a negative impact on guards, inmates, and prison resources. (*See* DPFOF ¶ 35.)

Last, no obvious, easy alternatives exist for the prison. The prison needs to be able to punish this activity by Lockett which flagrantly violated the rule against possession of gang material and threatened the security of the prison.

The material was not protected by the First Amendment, so the retaliation claims against Defendants fail as a matter of law.

## C.    Defendants were not motivated by the First Amendment activity.

Even if Lockett was obtaining the material to file a lawsuit, the claim fails because Brown did not issue the conduct report *because* of Lockett's plan to file a lawsuit. Brown was unaware of Lockett's intention to file a lawsuit when he issued the conduct report. He only knew that Lockett was in possession of gang material, and that the material was beginning to spread throughout the prison. (DPFOF ¶45.) The conduct report was motivated by a need to suppress gang activity, not by Lockett's alleged intention to file a lawsuit.

Likewise, Tom found Lockett guilty because of the gang material, not to suppress Lockett's ability to file a lawsuit. Lockett argued several defenses at the conduct report hearing, including that the material was for a lawsuit. But if Lockett wanted to bring a religion lawsuit, he did not proceed in an appropriate manner when he ordered contraband prior to any attempt to obtain the material via a DOC-2075 form. Tom's decision had nothing to do with Lockett's intention to file a lawsuit.

Thus, the retaliation claims fail on this basis as well.

**D.    The conduct report was issued for legitimate reasons.**

Finally, even if Lockett could prove a retaliatory motive, the retaliation claim must be dismissed because the conduct report was issued for legitimate reasons. *See Brown v. Phillips*, 801 F.3d 849, 855 (7th Cir. 2015) ("it is irrelevant if [a prison employee] may have had a retaliatory motive" if the defendant's conduct "is supported by a legitimate reason." (citing *Hammer v. Ashcroft*, 570 F.3d 798, 803 (7th Cir. 2009), *and Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005))). The Supreme Court has held that prisoners' associational rights "may be curtailed whenever the institution's officials . . . reasonably conclude that such associations . . . pose the likelihood of disruption to prison order or stability[.]" *Jones v. North Carolina Prisoners' Labor Union*, Inc., 433 U.S. 119, 132 (1977).

As discussed previously, it is imperative that prison officials monitor and prevent the spread of security threat group activity to maintain a safe and secure environment for the inmates, staff, visitors, and the community. (DPFOF ¶¶ 34-37.) To the extent Lockett continues to argue the Growth and Development material is religious doctrine and not gang recruitment material, the recent decision in *Turner v. Boughton* is instructive. No. 17-CV-203-JDP, 2021 WL 1200597, at *17 (W.D. Wis. Mar. 30, 2021). There, inmate Turner was issued conduct reports for writing letters that were believed to be coded gang communications. *Id.* *6. Turner disputed that his statements in the letters were meant to conceal gang communications. *Id.* *14. The court determined that the "bottom line" for the retaliation and substantive due process claims was not "whether defendants came to a correct decision about the true

purpose of Turner's letters, but rather whether there was a legitimate reason for them to pursue the conduct report." *Id.* * 17. Given the evidence and Turner's history of gang activities, the only reasonable inference was that defendants believed Turner was involved in gang communications. *Id.* Furthermore, "Even if defendants were ultimately wrong about the true purpose of Turner's letters, defendants do not violate the Constitution merely by making errors in disciplinary proceedings." *Id.* (citing *Heffernan v. City of Paterson*, 136 S. Ct. 1412, 1418 (2016); *Williams v. Brown*, No. 17-cv-11-bbc, 2017 WL 782958, at *2 (W.D. Wis. Feb. 28, 2017)). Regardless of whether Turner was actually speaking in code about the Gangster Disciples, "he does not adduce any evidence to show that defendants did not sincerely believe that he was doing so." *Id.*

Likewise, even if Brown or Tom were ultimately wrong about the true purpose of the Growth and Development materials, the conduct report was supported by the legitimate motivation of suppressing gang activity in the prison. This is especially true given Prude is known to be a leader in the Gangster Disciples, and Prude was obviously behind Lockett and Hayes's request for the material. (DPFOF ¶¶ 22, 24-26.) Defendants punished Lockett because the material at issue is gang material that can be used to recruit members to the Gangster Disciples. The retaliation claims must be dismissed.

**IV.    Defendants are entitled to qualified immunity.**

Even if the court declines to grant summary judgment on the basis of the facts presented above, Defendants are immune from any money damages under the doctrine of qualified immunity.

**A.    Overview of the law**

Qualified immunity protects government officials from facing suits for damages when their actions do not violate clearly established constitutional or statutory rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Once a defendant asserts a qualified-immunity defense, the plaintiff has the burden to establish that the defendant's action violated a clearly established right. *Estate of Escobedo v. Bender,* 600 F.3d 770, 779 (7th Cir. 2010). To be clearly established, a right "must be sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards,* 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012) (internal quotations and brackets omitted) (emphasis added). This is a high bar. *Kramer v. Pollard*, 497 F. App'x 639, 642 (7th Cir. 2012).

The Supreme Court recently reiterated, "the clearly established law must be 'particularized' to the facts of the case. … Otherwise, plaintiffs would be able to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, No. 16-67, 2017 WL 69170, at *4 (U.S. Jan. 9, 2017). To defeat a qualified-immunity defense, a plaintiff need not point to a case that is factually identical to the present suit, but "existing precedent must have placed the statutory or constitutional question *beyond*

*debate.*" *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (emphasis added). (internal citations, quotations, and brackets omitted).

Courts may decide qualified-immunity cases on the ground that a defendant's action did not violate a clearly established right without reaching the question of whether a constitutional right was violated at all. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

### B.    Defendants are entitled to qualified immunity on the retaliation claim.

If the Court finds Defendants retaliated against Lockett by punishing him for possession of gang material, they are entitled to qualified immunity. Lockett argues Defendants should have known they cannot confiscate legal materials and issue a conduct report without a valid penological justification. (Pl's Brief at 7.) However, they undoubtedly had a penological justification, as described at length above. Furthermore, it is not clearly established that inmates have a First Amendment right to possess gang material by simply recharacterizing their gang as a religion. It is certainly not beyond debate that an inmate has a right to possess recruitment material for Growth and Development by simply writing in "Growth and Development" on a Religions Preference form after filing a lawsuit.

Brown's decision to issue the conduct report at issue and Tom's decision to find Lockett guilty did not violate any clearly established right. Defendants are entitled to qualified immunity.

**V.    Lockett cannot recover compensatory or punitive damages.**

In his complaint, Lockett requested $50,000 in compensatory damages and $25,000 in punitive damages against the Defendants. (Dkt. 1:6.) He is not entitled to either of these as a matter of law.

**A.    Lockett cannot recover compensatory damages under § 1997e(e).**

Compensatory damages are not available in this case. Section 803(d) of the PLRA, codified as 42 U.S.C. § 1997e(e), entitled "Limitation on recovery," provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . .

In this case, Lockett does not allege any physical injury caused by Defendants. Thus, even if there were a constitutional violation, he would not be entitled to anything more than nominal damages. *See Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999) ("[N]ominal damages, of which $1 is the norm, are an appropriate means of vindicating rights whose deprivation has not caused actual, provable injury.").

**B.    Lockett fails to produce sufficient evidence to support any request for punitive damages.**

Punitive damages are permitted when a defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others, and this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness. *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Seventh Circuit Court of Appeals explained that to prove punitive damages are warranted, requires a showing that "the defendant almost

certainly knew that what he was doing was wrongful and subject to punishment." *Soderbeck v. Burnett Cnty., Wis.*, 752 F.2d 285, 291 (7th Cir. 1985).

Here, there is no evidence in the record to support that any of the defendants were motivated by any intent to harm Lockett. Defendants followed the required procedures at the disciplinary hearing. (DPFOF ¶ 38.) Lockett simply cannot produce sufficient evidence to support any award of punitive damages against the defendants. Therefore, summary judgment should be granted on his request for punitive damages. *See Purnick v. C.R. England, Inc.*, 269 F.3d 851, 853 (7th Cir. 2001).

## Conclusion

Defendants' motion for summary judgment should be GRANTED, Plaintiff's motion for summary judgment should be DENIED, judgment should be entered on Defendants' behalf, and this action against them should be dismissed with prejudice in its entirety.

Dated August 11, 2021.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ Rebecca A. Paulson
REBECCA A. PAULSON
Assistant Attorney General
State Bar #1079833

Attorneys for Defendants.

37

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0278
(608) 294-2907 (Fax)
paulsonra@doj.state.wi.us