IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JEREMY LOCKETT,

    Plaintiff,

v.                                             Case No. 20C0339

LEBBEUS BROWN, ET AL.,

    Defendants.

## DEFENDANTS' PROPOSED FINDINGS OF FACT

Defendants, by and through undersigned counsel, hereby submits their proposed findings of fact in support of their motion for summary judgment, as follows:

### Parties

1. Plaintiff Jeremy Lockett (DOC#511912) is currently incarcerated at Green Bay Correctional Institution (Green Bay). He was incarcerated at the Wisconsin Secure Program Facility (WSPF) prior to transferring to Green Bay. (DeGroot Decl. ¶ 4.)

2. Lockett identified as a Protestant/Other Christian on Wisconsin Department of Corrections' (Department) religious preference forms from 2013 until April 2020, when he submitted a new form in which he checked the "Other" category and wrote in "Growth and Development" in the space provided for additional information. (DeGroot Decl. ¶ 13; West Decl. ¶11.)

3. Defendant Gary Boughton is the Warden at the Wisconsin Secure Program Facility (WSPF) and has held this position since March 2014. (Boughton Decl. ¶ 2.)

4. Defendant Lebbeus Brown was the Unit Manager of Alpha Unit at WSPF at all times relevant to this case, and is now retired. (Brown Decl. ¶ 2.)

5. Brown was the Security Threat Groups Coordinator at WSPF for 13 years and has received specialized training on the identification and operation of prison and street gangs. He has the ability to recognize gang-related activities, and several of the trainings he attended included information on identifying differences between religious activity and gang-related activity in a prison setting. (Brown Decl. ¶¶ 2, 4-5.)

6. Defendant Craig Tom is a Captain at WSPF and was so at times relevant to this case. As a Captain, he filled-in as a hearing officer as needed as long as there were no conflicts. He was employed as a Lieutenant from 2006 until his promotion to Captain in 2018, and was assigned as the primary hearing officer in this role for approximately five years. He has been employed at WSPF since 1999. (Tom Decl. ¶¶ 2-3.)

7. Defendant Thomas Taylor is a Lieutenant at WSPF. (Dkt. 1, ¶ 5, Compl.)

**Growth and Development**

8. The Gangster Disciples began in the 1960's, when Larry Hoover and David Barksdale united their existing gangs to form the Black Gangster Disciple Nation in Chicago, Illinois. Hoover took charge of the Gangster Disciples in 1969,

2

after Barksdale was wounded in a shooting. His gang controlled of the South Side drug trade in Chicago. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

9. Hoover was in and out of prison several times in his early 20s for criminal activity. In 1973, Hoover and another Gangster Disciple member were charged with murdering a drug dealer. Hoover was sentenced to 150 to 200 years in prison and sent to a maximum-security prison in Illinois. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

10. In prison, Hoover's power grew. He protected other inmates, who became devotees and new recruits for the Gangster Disciples. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

11. Growth and Development was born in the mid 1980's. Hoover had begun to discourage violence among his followers. He made education mandatory for Gangster Disciple members and instructed his army to go to school, learn trades and develop talents and skills. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

12. Hoover changed the G.D. of "Gangster Disciple" to "Growth and Development." He began receiving positive attention from the outside. Growth and

Development created nonprofit organizations that registered voters, a music label that helped needy children, a series of peaceful protests to fight the closing of public programs, and a clothing line. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

13. Prison officials were dubious of Growth and Development. They saw Hoover's good intentions as a ploy to help his cause with the parole board. Friends and allies on the outside lobbied to get Hoover paroled for his contributions to society. Meanwhile, law enforcement agents insisted that he was finding new ways to expand his criminal ventures. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)); West Decl. ¶ 13; Brown Decl. ¶ 11.)

14. In the late 1980's, Hoover was transferred to a minimum-security prison in Illinois where he appeared to be living a luxurious lifestyle with new clothes, expensive jewelry, specially prepared meals and private visitations. Suspicious authorities began wire-tapping Hoover's private meetings and discovered he was running the Gangster Disciple group from within the prison system. Informants revealed that Hoover's nonprofit organizations were actually fronts for laundering drug money. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)).

15. In 1995, after a five-year undercover investigation by the federal government, Hoover was indicted on drug conspiracy charges. Hoover tried to portray his gang as a "do-gooder" group to help in his own defense strategy when he was on trial for the federal charges. This effort was written about in *The Impact of the Federal Prosecution of the Gangster Disciples*, by George W. Knox, Ph.D. Dr. Knox described that Hoover "bargained that if he was portrayed as a political prisoner, that he could sway the hearts and minds of a jury to acquit him." However, "[i]t backfired in a very big way, and in retrospect was exactly the kind of thinly disguised and deceitful posturing and megalomaniacal grandstanding that a prosecutor could benefit from." (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)); (George W. Knox, Ph.D, *The Impact of the Federal Prosecution of the Gangster Disciples*, National Gang Research Center (2008), https://ngcrc.com/ngcrc/page14.htm (last visited August 11, 2021)).

16. Dr. Knox's report describes,

> The idea that Larry Hoover was being prosecuted because he had transformed his gang into a lawful and politically active community organization was the kind of "sham" and "scam" that any person of normal intelligence could quickly see through. Members of the jury simply did not buy the scam that Larry Hoover was being persecuted by the federal government because he was a major political figure in the African-American community. It was a bizarre and counter-productive defense to the kind of criminal charges he was facing.

(George W. Knox, Ph.D, *The Impact of the Federal Prosecution of the Gangster Disciples*, National Gang Research Center (2008), https://ngcrc.com/ngcrc/page14.htm (last visited August 11, 2021)).

17. In 1997, Hoover was found guilty on all charges, and sentenced to six life sentences. He is currently serving his sentence at a supermax prison in Colorado. He remains the leader (Chairman) of the Gangster Disciples. (Biography.com Editors, *Larry Hoover*, The Biography.com website, (September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited August 11, 2021)); Brown Decl. ¶ 11; West Decl. ¶ 13)

18. The Gangster Disciples remain incredibly active in cities across America and maintain a significant presence in the U.S. prison system. The Gangster Disciples is structured like a corporation and led by a chairman of the board. Its main source of income is the street-level distribution of cocaine, crack cocaine, marijuana, and heroin. The gang also is involved in other criminal activity, including assault, auto theft, firearms violations, fraud, homicide, the operation of prostitution rings, and money laundering. (Brown Decl. ¶ 19; DeGroot Decl. Ex. 100, at 3, 4.)

19. Although members continue to try and conceal the true nature of Gangster Disciples by using the Growth and Development façade, the two organizations are one in the same. Growth and Development was and is a façade used to funnel drug profits of Gangster Disciples. Growth and Development is considered a security threat group by Wisconsin prison officials and treated the same as the Gangster Disciples. (Brown Decl. ¶¶ 10, 12, 19; DeGroot Decl. Ex. 100, at 4.)

### Conduct Report 3141599

20. Conduct Report 3141599 states that inmate Andre Tinnon handed out of his cell trap what appeared to be a legal envelope to Officer Brown (not Defendant

Brown). Tinnon asked the envelope to be returned to inmate Zachary Hayes. Officer Brown scanned the material quickly and saw the word Gangster Disciples. Officer Brown gave it to Sergeant Henneman, who turned it over to a supervisor for review. The material then went to Defendant Brown to review as the Security Threat Group Coordinator at WSPF. (DeGroot Decl. Ex. 100, at 1.)

21.     Defendant Brown saw the envelope was from the Western District Court to Hayes. The materials included: 1) Rod Emery's *The Blueprint: From Gangster Disciple to Growth and Development* (Copyright 1996); and 2) Larry Hoover's *Blueprint of the New Concept*, and other papers. On the top of the papers was a docket stamp (#23-1) from a civil case inmate Terrence Prude filed in the Western District of Wisconsin, *Prude v. Meli*, 17-cv-336. The materials were mailed to the court from a Milwaukee zip code (53204) although the envelope's return address showed Prude's WSPF address. The materials included a letter to the court asking the court to take judicial notice of them in Prude's lawsuit. (WDWI Case 17-cv-336[1], Dkt. 23; DeGroot Decl. Ex. 100, at 1-2.)

22.     Terrence Prude is a known leader among the Gangster Disciples in the Wisconsin Department of Corrections. (Brown Decl. ¶ 19; DeGroot Decl. Ex. 100, at 2; Ex. 104.)

---

[1] This Court can take judicial notice of filings in other district court cases. *See* FRE 201; *United States v. Doyle*, 121 F.3d 1078, 1088 (7th Cir. 1997) (taking judicial notice of district court's docket sheet in a different case). Because Lockett cannot access the internet, he will be allowed to review (but not keep), a copy of Dkt. 23 from Prude's case for the purpose of responding to this summary judgment. He will also be allowed to review the two internet articles cited by Defendants in their DPFOF (from biography.com and ngcrc.com).

23. In the conduct report, Brown described that the *Blueprint of the New Concept* has the "rules, creeds, violation for misconduct by the gang members and the structure of the Gangster Disciple in the DOC." Brown noted that it also has a picture of the leader (Chairman) Larry Hoover. (Brown Decl. ¶¶ 9, 13; DeGroot Decl. Ex. 100, at 2-3.)

24. Brown reviewed the docket in Prude's civil lawsuit further. He found that on July 16, 2018, Prude requested a copy of Docket #23 from the court. On July 30, 2018, Lockett requested a copy of Docket #23. On August 9, 2018, inmate Zachary Hayes requested a copy of Docket #23. Brown reviewed the requests and saw they were similar if not exact to Prude's writing in all three requests. (DeGroot Decl. Ex. 100, at 2.)

25. Staff completed cell searches of the inmates. Tinnon handed out a complete copy of document 1 (Emery's *Blueprint*). Hayes possessed part of document 2 (Hoover's *Blueprint*). Locket possessed documents 1 and 2. When Prude was asked for the documents, he ripped them into small pieces so that no one could verify if both documents were in his cell. (Brown Decl. Ex. 20; DeGroot Decl. Ex. 100, at 3.)

26. Brown concluded that Prude used his court case to get gang related material into the prison to help structure and recruit members into the Gangster Disciples. The inmates were caught passing the materials. Brown believed Prude destroyed his copies so staff could not verify if he had passed his copies. (DeGroot Decl. Ex. 100, at 3.)

27. The conduct report states: "Hoover attempted to change the perception of the Gangster Disciple by calling the gang Growth and Development and a book was copyrighted in 1996 which includes From Gangster Disciples to 'the blueprint' Growth and Development, the gang continued in the same criminal activities." (DeGroot Decl. Ex. 100, at 3.)

28. In the conduct report, Brown states: "The Gangster Disciple uses the 6 point star with each point with a name. The 6 points stand for Love, Life, Loyalty, Knowledge, Wisdom, and understanding the same as Growth and Development 6 principles." It also states, "In the Blueprint of the New Concept the front page has the 6 point star and the leader Larry Hoover." (DeGroot Decl. Ex. 100, at 3-4.)

29. Brown noted details about the materials he reviewed, including: "On page 7 [of Hoover's *Blueprint*] are the sixteen laws '1 silence + secrecy: No member shall give information or discuss any matter concerning any member or function of this organization with anyone who is not a standing member." Brown noted that Page 8 of Hoover's *Blueprint* has the Seventeen Laws, and Number 12 states "Aid and assist: all members shall aid and assist one another in all Righteous endeavors." Page 49 of the materials lists the institution structure and duties of the ranks of the Gangster Disciples. (DeGroot Decl. Ex. 100, at 3-4; Case 17-cv-336 Dkt. 23-2:7-8, 23-2:49.)

30. There are various recitations in the materials which would be used to build loyalty and allegiance to Gangster Disciples, including "The Hoover Prayer, which includes the line: "Just G's and D's; No 5's or P's; No V's No L's . . ." (Dkt. 23-

9

1:94.) The reference to No 5's or P's and No V's No L's is a reference to rival gangs to the Gangster Disciples. "Just G's and D's" is the Gangster Disciples whose symbol is the 6-pointed star and who identify with the Folk Nation. "No 5's or P's" is in reference to the People Nation with the 5-pointed star symbol, and the enemy of the Folk Nation and Gangster Disciples. "No V's No L's" is the People Nation Vice Lords. Other recitations reference Gangster Disciples and incorporate imagery of putting a gang member to rest with a six-pointed star and two shotguns upon his chest. (Brown Decl. ¶¶ 16, 17; Case 17-cv-336 Dkt. 23-1:94-95.)

31. Brown noted that, "In the Wisconsin Department of Corrections, both Gangster Disciples and Growth and Development are considered a Security Threat Group. The GD in prison continues to violate the DOC rules such as fighting, gambling, extortion, and sanction of their own member which include fines to physical confrontation. This makes Gangster Disciples a high risk to the safety of the Institution, staff, and other inmates." (DeGroot Decl. Ex. 100, at 4.)

32. On September 28, 2018, Brown completed conduct report #3141599, charging Lockett with Group Resistance and Petitions and Possession of Contraband – Miscellaneous. Brown concluded, based on his training and experience, the inmates were "in possession of gang material or actively participating and using the material to recruit . . . other inmates into the Security Threat Group, Gangster Disciples." (DeGroot Decl. Ex. 100, at 1-4.)

33. Security Threat Group Specialist Sergeant Lange reviewed the evidence on October 1, 2018 and agreed with Brown's determination that the activity was

associated with Security Threat Group Activities. (DeGroot Decl. Ex. 100, at 9.) Circulation of the Blueprints in the institutions could be used for recruitment purposes and for teaching inmates about the Gangster Disciples. The materials include information about collection of dues (Dkt. 23-1:100); house policies, including consequences (Dkt. 23-1:105); chain of command (Dkt. 23-1:107); and a membership application (Dkt. 23-1:116). (Brown Decl. ¶¶ 14, 18.)

34. Corrections staff try to monitor and prevent the spread of security threat group activity in order to maintain a safe and secure environment for the inmates, staff, visitors, and the community. (Brown Decl. ¶ 8.)

35. Security threat groups play a role in many of the riot situations, criminal activity, drug use, and violence that takes place in the institutions. Gang activity is detrimental to the individual inmates and their rehabilitation efforts, as it makes some inmates feel unsafe in a prison environment, and some are physically endangered given the presence of rival groups. (Brown Decl. ¶ 8.)

36. Gangs often undermine prison authority and take an oppositional stance against rules and prison administration. Members use their contacts on the outside to assist in introducing contraband in the facilities. (Brown Decl. ¶ 8.)

37. Recruitment efforts for gangs are common in prison and high-ranking gang leaders have successfully run the criminal enterprises within institution walls. (Brown Decl. ¶ 8.)

## Disciplinary Hearing

38.   On November 16, 2018, a disciplinary hearing was conducted regarding conduct report 3141599. Defendant Tom served as the hearing officer and conducted the hearing pursuant to the rules in Wis. Admin. Code Chapter DOC 303. (Tom Decl. ¶¶ 6, 8; DeGroot Decl. Ex. 100, at 5-6.)

39.   Lockett gave a statement at his disciplinary hearing arguing that he purchased the "legal document" to "launch a lawsuit against Brown for harassment against my religion." He also said Prude asked him to draft an open records request to the clerk to buy the documents from his case so Prude could assist Lockett in a lawsuit. Lockett described that he filled out a disbursement for $11.60 and sent it to the business office to mail a check to the court. The business office processed the request and took the money out of his account. The court clerk received the funds and mailed him the documents "to support [his] lawsuit." Lockett then described the prison staff brought the "legal mail" to his cell front and opened it in front of him, scanned it for contraband, and gave him the "legal materials." (Tom Decl. ¶ 11; DeGroot Decl. Ex. 100, at 5.)

40.   Lockett submitted his property receipt as evidence, showing staff had allowed him to possess the materials he ordered from the court docket. (Tom Decl. ¶¶ 14, 16; DeGroot Decl. Ex. 100, at 14.)

41.   Lockett argued at the hearing that his Fourteenth Amendment rights were violated by failing to provide him notice of the prohibited conduct because there

12

is "nothing [in] DOC 303.24 that indicates directly or indirectly that the actions listed above . . . were prohibited." (DeGroot Decl. Ex. 100, at 5.)

42. Lockett's also argued was that his First Amendment rights were violated by confiscating his documents. He claimed this suppressed his speech. He argued the document, which was also his "religion teachings," does not raise any legitimate security concerns. (DeGroot Decl. Ex. 100, at 5.)

43. Lockett also argued he was being punished for obtaining documents from open records. (DeGroot Decl. Ex. 100, at 5.)

44. Inmates frequently use religious services and literature, as well as legal mail, to cover up security threat group activity. (Brown Decl. ¶ 27.)

45. Brown was unaware of Lockett's intention to file a lawsuit when he issued the conduct report. Brown only knew that Lockett was in possession of gang material, which was considered contraband, and that the material was beginning to spread throughout the prison. (Brown Decl. ¶¶ 20-21.)

46. Lockett requested one witness to appear at his disciplinary hearing, Terrence Prude. Prude answered questions Lockett posed at the hearing. Prude confirmed the material came from a pending case of his. Prude claimed he notified Lockett about the material so that Lockett could file a religious lawsuit in court. Prude admitted to helping Lockett request the documents by writing the open records request. Lockett asked Prude if the materials were "under teachings of our religion" and Prude answered "Yes." (Tom Decl. ¶¶ 14-15; DeGroot Decl. Ex. 100, at 7, 10.)

47. At the disciplinary hearing, Tom considered the evidence, including the conduct report statement, the Growth and Development materials, and Lockett and Prude's verbal testimony. (Tom Decl. ¶ 9; DeGroot Decl. Ex. 100, at 5-6.)

48. Tom decided it was more likely than not that Lockett committed the alleged violations of Wis. Admin. Code §§ 303.24 and 303.47. His decision largely reiterated the statement in the conduct report. He concluded Lockett's testimony was self-serving in an attempt to minimize his responsibility for his actions. He found Prude's testimony was not credible, as it "appeared to be rehearsed." Tom noted, "Inmates try and hide/conceal gang literature in legal correspondence and under religion." (Tom Decl. ¶¶ 19-20; DeGroot Decl. Ex. 100, at 5-6.)

49. Pursuant to the Schedule of Penalties in Wis. Admin. Code § 303.72 and based on the seriousness of the charges for which Lockett was found guilty, Tom issued a disposition of 120 days disciplinary separation. (Tom Decl. ¶ 21; DeGroot Decl. Ex. 100, at 6.)

50. Lockett appealed the conduct report decision. The finding of guilt and disposition was affirmed by Deputy Warden Jaeger, who was acting as the Warden's designee. (Boughton Decl. ¶ 10; DeGroot Decl. Ex. 100, at 17-18.)

51. Warden Boughton did not review or process Lockett's appeal at the time. (Boughton Decl. ¶ 10; DeGroot Decl. Ex. 100, at 17.)

52. Lt. Taylor was not involved in any way with Lockett's conduct report. He was the hearing officer for Prude's conduct report, but Prude is no longer a

Plaintiff in this lawsuit. (Dkt. 1 ¶ 29, Compl.; Dkt. 9; Dkt. 11; Tom Decl. ¶ 24; DeGroot Decl. Ex. 100, at 5-6.)

53. Lockett did not file any inmate complaints about the conduct report or disciplinary hearing after receiving the decision on his appeal. (DeGroot Decl. ¶¶ 11-12 Ex. 103, at 2.)

**Religious Preference Form**

54. Inmates have a right to declare any religious preference while incarcerated in a DAI facility. They do so via oral interview during intake procedures, or by completing a DOC-1090 "Religious Preference" form. They are encouraged to identify an Umbrella Religion Group (URG), "Other" or "No Preference" which most closely correlates with their personal beliefs and practices. (West Decl. ¶ 9.)

55. On the form there is a space provided for inmates to provide additional religious affiliation/identification for DOC's data-collection purposes. This form field/space is completely optional. The inmates are given examples, such as if they chose the Native American/American Indian URG, they may indicate a specific tribe. (West Decl. ¶ 10.)

56. "Growth and Development" or any other self-identified labels can certainly be written on the form, but that does not mean that it is registered, recognized, sanctioned, authorized or approved as a religion by the Department of Corrections. (West Decl. ¶ 12.)

57. There is a process specified in DAI policy 309.61.01 by which inmates can request approval for new religious practices not currently authorized by

15

Corrections policies. Inmates seeking a religious accommodation not currently allowed by policy are required to submit a DOC-2075 "Request for New Religious Practice" form through the Chaplain at their facility to request such an item or accommodation. This is the administrative remedy available for the unique considerations of religious beliefs and practices within the confines of a correctional facility. (West Decl. ¶ 15, Ex. 105, at 10; Brown Decl. ¶ 25.)

58. The DOC-2075 is reviewed by the Chaplain and Chaplain Supervisor at the institution, who each make a recommendation and then forward the DOC-2075 to Corrections' Central Office. The RPAC Executive Committee then conducts a thorough review, researches and consults community advisors as needed, and makes a recommendation. The final decision is made by the facility Warden, based on the cumulative recommendations. (West Decl. ¶ 16 Ex. 105, at 10.)

59. Completing and submitting a DOC-2075 is an important and necessary step in the process of reviewing inmate requests for new religious practices, alterations of religious practices, new religious property items, religious diets and any other changes to the DAI policies governing religious practices, property and diets. This is because the process allows staff members with specialized knowledge/experience/expertise at the institution level and at the division level (DAI) an opportunity to review the request, consider options for accommodation, to consult with religious advisors and security personnel, and to advise the facility Warden based upon the totality of available information. (West Decl. ¶ 18.)

60. The DOC-2075 process has led to various changes in the DAI religious policies (DAI Policy Nos. 309.61.01, 309.61.02 and 309.61.03) to accommodate sincere inmate religious requests. This process has also been effective to authorize individualized accommodation for certain religious practices and property items which are not widespread throughout a particular religious tradition. (West Decl. ¶ 19.)

61. If the DOC-2075 request is denied, an inmate can file an inmate complaint about it, and ultimately file a lawsuit if he chooses. (West Decl. ¶ 22.)

62. A few inmates have submitted DOC-2075s seeking accommodations related to Growth and Development and the requests have been thoroughly reviewed and decided upon. Records indicate that Lockett has never submitted a DOC-2075 request. (West Decl. ¶¶ 21-22.)

63. Brown does not recall an alleged conversation with Lockett about possessing Growth and Development material. Brown would never tell any inmate that he could possess security threat group material and the inmate would not get into trouble if he did. As the Security Threat Group coordinator at that time, there is no way Brown would knowingly allow security threat group material to come into the institution. If Lockett thinks that Brown said anything that condoned his purchasing of the Blueprints from Prude's civil lawsuit's docket, either Brown misunderstood what Lockett was asking, or Lockett misunderstood Brown's response. (Brown Decl. ¶ 24.)

Dated August 11th, 2021.

    Respectfully submitted,

    JOSHUA L. KAUL
    Attorney General of Wisconsin

    Electronically signed by:

    s/ Rebecca A. Paulson
    REBECCA A. PAULSON
    Assistant Attorney General
    State Bar #1079833

    Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0278
(608) 294-2907 (Fax)
paulsonra@doj.state.wi.us