IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JEREMY LOCKETT,

                              Plaintiff,

        v.                                                OPINION and ORDER

LEBBEUS BROWN, LT TAYLOR, CAPT TOM,                       20-cv-339-jdp
and GARY BOUGHTON,

                              Defendants.

---

Plaintiff Jeremy Lockett, appearing pro se, alleges that when he was incarcerated at Wisconsin Secure Program Facility, defendant prison officials disciplined him for working on a lawsuit about religious discrimination at the prison. Lockett says that to prepare for his lawsuit, he obtained materials discussing his religion, called "Growth and Development." The Wisconsin Department of Corrections considers Growth and Development to be a front for activity by the Gangster Disciples; prison officials disciplined Lockett for possessing the materials. Lockett contends that defendants violated his First Amendment rights by retaliating against him for working on a lawsuit, and that they violated his rights under the Fourteenth Amendment's Due Process Clause by punishing him under disciplinary regulations too vague to put him on notice that possessing the materials violated the rules.

The parties have filed cross-motions for summary judgment. For reasons stated below, I will deny Lockett's motion, grant defendants' motion, and dismiss the case.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

**A.  Parties**

Plaintiff Jeremy Lockett is currently incarcerated at Green Bay Correctional Institution. His claims involve events occurring while he was incarcerated at Wisconsin Secure Program Facility (WSPF).

All of the defendants worked at WSPF during the events in question. Defendant Lebbeus Brown was a unit manager. Defendant Craig Tom was a captain. Defendant Gary Boughton was the warden. Defendant Thomas Taylor was a lieutenant.

**B.  Lockett's conduct report**

This case concerns disciplinary proceedings initiated against Lockett in conjunction with an investigation into his possession of materials prison officials believed to be associated with a gang called the Gangster Disciples. Lockett says that he is not a member of this gang. Rather, he follows a religion called "Growth and Development," which "condemns criminal activity of all kinds." Dkt. 29, ¶ 5.

Defendants dispute that Growth and Development is a religion. The Department of Corrections considers it to be a cover for Gangster Disciple activity and the department treats it as an unsanctioned security threat group. "Security threat group" is the DOC's term for a gang.

Lockett says, "The DOC's handling of GD members is to discipline believers." *Id.*, ¶ 7. Lockett says that because DOC staff punished members of Growth and Development, he wanted to file a lawsuit about religious-based harassment. Fellow inmate and Growth and Development adherent Terrance Prude told Lockett that to win his claims he needed to present

2

evidence that Growth and Development does not advocate illegal activities, which led Lockett to obtain a copy of the Growth and Development materials at issue here.

Lockett says that prison officials condoned his possession of the materials at issue. In particular, at some point before obtaining the materials, Lockett says that he asked defendant Brown whether he could list Growth and Development on his religious preference form, with Brown saying he could, but that he would not be able to have Growth and Development religious services in the chapel. Lockett asked Brown whether he would be punished for possessing Growth and Development teachings condemning illegal conduct given the DOC's position that Growth and Development "teach[es] illegal conduct," *Id.*, ¶¶ 11–12, with Brown answering that Lockett could possess those materials. Lockett asked Brown, "Am I allowed to buy evidence from a case for legal litigation purposes of Growth & Development's education which advocates positivity?" *Id.*, ¶ 11. Brown said that he could. Defendants dispute that this conversation took place and that Brown would not have told a prisoner that he could possess Growth and Development materials.

Lockett says that because of his discussion with Brown, in late July 2018 he sent the business office a request for disbursement of funds to this court "[t]o pay for legal material in the form of a case file." Dkt. 43-1, at 14. The business office approved the disbursement. Lockett asked this court for copies of documents that had been docketed in a case that Prude had previously filed in this court, No. 17-cv-336-wmc. The court sent Lockett the documents. In late August 2018, the documents arrived. Unnamed prison staff opened the envelope in front of Lockett, inspected each page, and handed the documents to him, saying, "here's your legal mail." Dkt. 29, ¶ 14. The materials included paper copies of two books: *Blueprint of the*

*New Concept* by Larry Hoover; and *The Blueprint: From Gangster Disciple to Growth and Development*, by Rod Emery.

Lockett wasn't the only WSPF prisoner who obtained copies of these documents. In September 2018, officers reviewed an envelope of legal materials that inmate Andre Tinnon gave to an officer to return to inmate Zachary Hayes. An officer saw the words "Gangster Disciples" on the materials so they were routed to defendant Brown, who also worked as the WSPF security threat group coordinator.

The envelope was addressed from this court to Hayes. The materials inside included the publications by Hoover and Emery. The papers bore a docket stamp from Prude's '336 lawsuit in this court and included a letter to the court asking the court to take judicial notice of them in Prude's lawsuit. Brown saw that the materials in Prude's case were mailed to the court from a Milwaukee zip code even though the envelope's return address showed Prude's WSPF address. DOC officials believe that Prude is a leader in the Gangster Disciples in the Wisconsin prison system, and Prude has previously been disciplined for attempting to organize that gang in the prison system. Defendant Brown's review of the docket in Prude's '336 case showed that in a three-week span in July and August 2018, Prude, Lockett, and Hayes all made similar requests for copies of the materials docketed in Prude's case.

Staff searched the inmates' cells. Tinnon had a complete copy of Emery's publication. Hayes had part of Hoover's publication. Lockett had both publications. When Prude was asked for the documents, he ripped them into small pieces so that no one could verify if both documents were in his cell.

Brown concluded that Lockett, Prude, and the others used Prude's court case to get gang-related material into the prison to help organize the Gangster Disciples and recruit members into the gang.

On September 28, 2018, defendant Brown completed a conduct report charging Lockett with "Group Resistance and Petitions," Wis. Admin. Code § DOC 303.24, and "Possession of Contraband–Miscellaneous," § DOC 303.47, for obtaining the publications by Hoover and Emery. Lockett says that defendant Brown told him that because inmates Tinnon and Hayes were being given conduct reports that it would be unfair to not write up Lockett for possessing the same materials. Lockett asked Brown why he couldn't just confiscate the materials instead of giving him a conduct report, especially because he thought that Brown had told him that he could have the materials. Lockett says that Brown told him "yeah I know and I apologize but the other guys Hayes and Tinnon messed it up for you so everyone must get punished for possessing it. I'm sorry." Dkt. 29, ¶ 17. Defendants deny that Brown had this conversation with Lockett.

Because the conduct report against Lockett and the parties' briefing mostly focus on Hoover's book *Blueprint of the New Concept*, this opinion will also focus on that book. Before addressing the contents of that book, I will address additional evidence provided by defendants.

Defendants present information about Hoover's life and gang leadership from two online sources, the website Biography.com and an organization called the National Gang Crime Research Center.[1] These sources say that Hoover changed the name of the Gangster Disciples

---

[1] *See* Biography.com, *Larry Hoover* (April 2, 2014, last updated September 12, 2019), https://www.biography.com/crime-figure/larry-hoover (last visited January 24, 2022); George W. Knox, *The Impact of the Federal Prosecution of the Gangster Disciples* (2008) https://ngcrc.com/ngcrc/page14.htm (last visited January 24, 2022).

to Growth and Development in a ploy to make it appear as if Hoover had reformed the gang into an organization disavowing criminal activity, but that in reality Hoover continued to lead a criminal gang. Lockett calls the "characterization of Mr. Larry Hoover [in these accounts] is a false-narrative echoed," although he doesn't explain in detail which parts he disagrees with. Dkt. 46, at 1. In any event, if defendants offer this information to prove the truth of Hoover's life and gang activities, it is inadmissible hearsay. But the parties do not dispute that Hoover is a founder of the Gangster Disciples who is now incarcerated in federal custody, that at some point Hoover helped create "Growth and Development" as an organization that its members say is non-violent, and that the DOC believes that Growth and Development is a front for Gangster Disciple gang activities.

In Lockett's conduct report, Brown explained why Hoover's book *Blueprint of the New Concept* is a contraband gang publication.[2] The publication is a description of the Growth and Development organization, including its rules, officer titles, and organizational structure. The cover has a six-pointed star, which Brown says is a symbol of the Gangster Disciples. The first "law" of the group is "Silence and Secrecy: No member shall give information or discuss any matter concerning any member or function of this organization with anyone who is not a standing member." Dkt. 43-1, at 4 (quoting Hoover's *Blueprint of the New Concept*, Dkt. 51-2, at 7).

At summary judgment, Brown adds that the document includes a section called "The Hoover Prayer," including the line "Just G's and D's; No 5's or P's; No V's No L's." Dkt. 51-2,

---

[2] Defendants did not place copies of either publication on the docket, instead referring to the copies in the docket of Prude's case. I have directed the clerk of court to docket copies of these documents in this case, under seal. Dkt. 51-1 and Dkt. 51-2.

at 33. Brown says that "5's or P's" refers to rival gang People Nation, which uses a 5-pointed star symbol, and that "V's or L's" refers to the People Nation Vice Lords. A section called the "GD Prayer" states in part "so when I lay down just put me to rest with a six point star and two shotguns laid upon my chest." *Id.* at 34. There is a section discussing payment of dues. *Id.* at 42. The "house policies" section includes penalties such as "mandatory mouth shot[s]" for "ignorant outbursts," as well as verbal warnings and fines. *Id.* at 44. There are chain-of-command examples, including a chairman at the top and recruits on the bottom. *Id.* at 46–47. The document concludes with a membership application. *Id.* at 55.

Brown stated that the DOC considers the Gangster Disciples and Growth and Development together to be a security threat group, and that its members violate DOC rules against fighting, gambling, extortion, and sanctioning its own members. Brown concluded the conduct report by stating that Lockett and the other inmates possessing the materials were "in possession of gang material or actively participating and using the material to recruit . . . other inmates into the Security Threat Group, Gangster Disciples." Dkt. 43-1, at 4.

Security Threat Group Specialist Sergeant Lange (who is not a defendant) reviewed the evidence and agreed with Brown's determination that Lockett's actions were "associated with Security Threat Group Activities." Dkt. 43-1, at 9.

On November 16, 2018, defendant Tom conducted a disciplinary hearing on Lockett's conduct report. Lockett testified that the materials were a "legal document" that he intended to use to "launch a lawsuit against Brown for harassment against my religion." *Id.* at 5. He said that Prude asked him to draft an open records request to the clerk to buy the documents from

his case so Prude could assist Lockett in a lawsuit.[3] Lockett said that prison staff let him have the documents: he explained how he sent a disbursement request to the business office, the request was approved, this court sent the documents to him, and officers handed him the documents after scanning them for contraband. He also submitted a property receipt showing that staff let him have the materials. He argued that the disciplinary rule against group resistance and petitions didn't put him on notice that the materials he purchased were forbidden. Prude testified at the hearing that the materials that he and Lockett sought were "under teachings of [Prude's and Lockett's] religion." *Id.* at 7.

Defendant Tom found Lockett guilty of violating both the group resistance and contraband regulations. Tom stated that he found Lockett's testimony not credible and that "Inmates try and hide/conceal gang literature in legal correspondence and under religion." *Id.* at 6. Tom issued a disposition of 120 days disciplinary separation, although I take Lockett to be saying that the conviction led to him being placed in other forms of segregation for additional time after his sentence was served.

Lockett appealed the conduct report decision, arguing in part that the regulations at issue did not give him proper notice that his conduct was prohibited. The finding of guilt and disposition were affirmed by non-defendant Deputy Warden Jaeger.

## C.  DOC religious procedures

Inmates have a right to declare any religious preference while incarcerated in a DOC adult facility. They do so in an interview during intake procedures, or by completing a

---

[3] Prude was initially a co-plaintiff in this lawsuit, originally filed in the Eastern District of Wisconsin. Prude submitted a notice of voluntary dismissal and the court granted Lockett's motion to transfer the case to this court. Dkt. 11.

"Religious Preference" form. They are encouraged to identify one of the various "Umbrella Religion Groups," "Other" or "No Preference," depending on which most closely correlates with their personal beliefs and practices. On the form there is a space provided for inmates to provide additional religious affiliation identification for DOC's data-collection purposes. Responding in this space is optional. The inmates are given examples, such as if they chose the Native American/American Indian umbrella group, they may indicate a specific tribe.

At the time in question, Lockett identified as a Protestant/Other Christian on Wisconsin Department of Corrections religious preference forms. In April 2020 he submitted a new form in which he checked the "Other" category and wrote in "Growth and Development" in the space provided for additional information. Fellow inmate Prude wrote "Growth and Development" on his own form in August 2018. Defendants say that inmates can write whatever they want on that space on the form, including "Growth and Development," but that does not mean that the DOC condones or sanctions the groups written there.

The DOC has a policy by which inmates can request approval for new religious practices not currently authorized. Inmates seeking a religious accommodation not currently allowed by policy are required to submit a "Request for New Religious Practice" form through the chaplain at their facility to request an item or accommodation. Requests are reviewed by a committee and the final decision is made by the warden. An inmate whose request is denied may follow up with a grievance.

**D. Proposed expert testimony**

Lockett asks the court to take judicial notice of a declaration by Clemens Bartollas dated May 10, 2010, and filed in another of Prude's cases in the Eastern District of Wisconsin, Dkt. 112-4 in No. 14-cv-856 (although the document itself bears a caption from a Dane

County Circuit Court case No. 02CV3480). In that declaration, Bartollas (a professor of sociology at the University of Northern Iowa) states that an inmate should have the First Amendment right to possess printed materials about Growth and Development and shouldn't be punished for owning those materials.

This is really an attempt at providing expert testimony, which I will reject. Lockett didn't make formal expert disclosures by his deadline. And in any event this case isn't about whether Lockett has a First Amendment right to possess the materials or whether defendants properly followed state regulations by disciplining Lockett. Lockett brings only First Amendment retaliation and due process lack-of-notice claims, for which Bartollas's declaration does not provide helpful testimony. I won't consider the declaration.

Defendants disclose defendant Brown as a non-retained expert regarding prison gangs given his long-time role as a security threats group coordinator at the prison, and in his declaration he discusses the danger that gang activity poses to prison operations and more specifically about the history of misconduct at WSPF by members of the Gangster Disciples and Growth and Development. But defendants' expert disclosure provides only a vague explanation of the issues about which Brown would testify to as an expert; they do not disclose a summary of the facts and opinions to which Brown is expected to testify, as required under Rule 26(a)(2)(C). So I will not allow Brown to provide expert testimony. Nonetheless, much of his declaration is testimony about his firsthand experiences at WSPF that he is allowed to present as a lay witness. I will also allow defendants to present Brown's opinions contained in the conduct report for the purpose of explaining why defendants took the actions they did.

ANALYSIS

The parties agree that defendants Boughton and Taylor were not personally involved in any of the alleged deprivations of Lockett's rights, and that they should be dismissed. So I will grant defendants' motion for summary judgment on the claims against these defendants. That leaves Lockett's First Amendment retaliation claims and Fourteenth Amendment due process lack-of-notice claims against defendant Brown for issuing him the conduct report and against defendant Tom for convicting him.[4]

## A. Retaliation

Lockett contends that defendants retaliated against him when they issued him a conduct report for possessing gang materials and then punished him. To establish a First Amendment retaliation claim, a plaintiff must allege that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decision to take those actions. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the plaintiff makes this showing, the burden shifts to defendants to show that they would have taken the same action even without the retaliatory motive. *Greene v. Doruff*, 660 F.3d 975, 977 (7th Cir. 2011). In considering a retaliation claim, the court must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Babcock v.*

---

[4] Lockett's case does not include claims for violations of his rights to practice his religion. *See* Dkt. 15 (Lockett responded to the court's screening order discussing potential religious-discrimination claims by stating that he did not wish to bring such claims in this lawsuit.)

11

*White*, 102 F.3d 267, 275 (7th Cir. 1996) (internal quotations and citations omitted); *see also Holleman v. Zatecky*, 951 F.3d 873, 880 (7th Cir. 2020) (citing *Babcock*).

It is undisputed that Lockett received the conduct report for obtaining "Growth and Development" materials. Lockett says that materials are religious in nature and that he obtained the materials to prepare a lawsuit about deprivation of his religious rights. Generally speaking, preparing a lawsuit is an activity protected by the First Amendment. I'll assume for purposes of this opinion that Lockett was engaged in First Amendment activity. And defendants effectively concede that the punishment Lockett received would deter a person of ordinary firmness from similar activity in the future.

That leaves the question of whether defendants were motivated, at least in part, to retaliate against Lockett for preparing a lawsuit. Defendants say that they had a legitimate reason for charging and punishing Lockett: he was part of a group of several inmates who obtained what they believe are Gangster Disciple documents from Prude's case. It is well settled that prisons have legitimate interests in maintaining security and thwarting gang activity.

Lockett says that "Growth and Development" is a religion, not a gang. He contends that defendants' retaliatory intent can be inferred from the fact that they failed to reasonably respond to a penological interest; instead their actions were an "exaggerated response" to his possession of the materials. Dkt. 27, at 7 (citing *Greybuffalo v. Kingston*, 581 F. Supp. 2d 1034, 1041 (W.D. Wis. 2007), which in turn quotes *Turner v. Safley*, 482 U.S. 78, 98 (1987), for the proposition that a prison restriction "violates the First Amendment when the restriction is not 'reasonably related' to legitimate penological interests but instead is an 'exaggerated response' to such interests."). He says that defendants' response was exaggerated because they were "directly responsible for [his] possession of the materials" in the first place. Dkt. 45, at 5. He

says that defendant Brown initially told him that he could obtain those materials; that the prison business office authorized disbursement of funds for him to purchase the materials from the clerk of court; and that when the materials were mailed to the prison, staff reviewed the materials before giving them to him. He contends that defendants could not have been pursuing a legitimate security interest in punishing him for having materials they previously approved. He argues that "defendants should be estopped from now invoking [a security rationale] seeing [as] their very own security staff gave it to him. Defendants cannot have it both ways." *Id.* at 6.

The problem for Lockett is that his retaliation claims are not about whether it was in some general sense unfair that he was punished for possessing materials that he was initially allowed to have. I am aware of no authority suggesting that prison officials are forbidden from changing their minds about whether particular materials are contraband. Nor is the question even whether it was objectively correct under prison rules for defendants to discipline him. The question is whether defendants disciplined Lockett because he was preparing a religious-discrimination lawsuit. Evidence about non-defendant prison officials disbursing funds for Lockett's purchase of copies or reviewing the materials once they arrived at the prison is irrelevant to his retaliation claims against Brown and Tom.

And Lockett's evidence about Brown's actions aren't really helpful anyway. In his declaration, Lockett says that Brown told him that he could list Growth and Development on his religious preference form, that he would not get into trouble for possessing Growth and Development teachings condemning illegal conduct, and that for purposes of preparing a lawsuit of his own he was allowed to obtain evidence about Growth and Development's "education which advocates positivity." Dkt. 29, at 3. But these are extremely broad statements

about what Lockett was permitted to do or have. These broad statements say nothing about Brown's intentions in later giving Lockett the conduct report for the specific documents at issue. Brown did not give Lockett blanket consent to possess whatever Growth and Development materials he wanted.

More significant is Lockett's account of a discussion with Brown at the time of the conduct report. Brown stated that because other inmates were being disciplined for possessing the materials, "it would be unfair to not write [Lockett] up for possessing it too." Dkt. 29, at 4–5. When Lockett asked why Brown wouldn't just confiscate the materials instead of also giving him a conduct report, Brown answered, "yeah I know and I apologize but the other guys Hayes and Tinnon messed it up for you so everyone must get punished for possessing it. I'm sorry." *Id.* at 5. And although neither party notes it in their summary judgment materials, the property receipt issued for the items arriving at the prison, stating the titles of those documents, appears to have been signed by defendant Brown. Dkt 43-1, at 14.

As a whole, Lockett's version of events suggests that Brown had at least some knowledge of Lockett having those documents and that he did not initially consider it a problem, only later giving him a conduct report after other inmates were found to possess the same materials. But Lockett doesn't explain how one can infer from those events that Brown issued the conduct report to *retaliate* against him for preparing a lawsuit. At most Lockett shows that Brown only reluctantly gave him a conduct report to stay consistent with the discipline against other inmates who obtained the Growth and Development materials. Brown's desire for disciplinary consistency does not show retaliatory intent. And whether Brown only reluctantly issued the conduct report isn't material: even an intentionally fabricated conduct report doesn't run afoul

of the Constitution unless the issuing officer is motivated by the intent to retaliate for protected activity. *See Black v. Lane*, 22 F.3d 1395, 1402 (7th Cir. 1994).

As for defendant hearing officer Tom, the undisputed evidence shows that he considered the evidence raised in the disciplinary proceedings and that his stated rationale for disciplining Lockett was that the Growth and Development materials were used to recruit members into the Gangster Disciples. Lockett does not present any evidence suggesting that Tom's stated rationale was a pretext or that Tom held animus toward Lockett's efforts to prepare a religious-discrimination lawsuit. The only reasonable inference from the facts here is that Tom believed that the materials were contraband gang communications. Even if Tom was ultimately incorrect about the true purpose of the Growth and Development materials, defendants do not violate the Constitution merely by making errors in disciplinary proceedings. *See Heffernan v. City of Paterson*, 578 U.S. 266, 272 (2016) (adverse act because of "mistaken belief" does not violate First Amendment); *Williams v. Brown*, No. 17-cv-11-bbc, 2017 WL 782958, at *2 (W.D. Wis. Feb. 28, 2017) (no First Amendment retaliation claim against officer who gave conduct report for prisoner who failed to give officer information about an assault; "even if it is true that [the prisoner] had no information to give and [the officer] believed mistakenly that [the prisoner] was lying, a mistake is not a First Amendment violation").

No reasonable jury could conclude that Brown or Tom were motivated, even in part, to retaliate against Lockett for his work on the lawsuit. Accordingly, I will grant defendants' motion for summary judgment on Lockett's retaliation claims, and I will deny Lockett's motion for summary judgment on those claims.

**B. Due process**

Lockett brings claims that defendants violated his rights under the Due Process Clause of the Fourteenth Amendment by convicting him under disciplinary regulations that were too vague to properly give him notice that his conduct was prohibited.

In their brief responding to Lockett's summary judgment motion and supporting their own summary judgment motion, defendants initially argue that Lockett was not granted leave to proceed on a due process theory about the vagueness of the regulations he was convicted under. That is incorrect. When I screened Lockett's complaint I construed his due process claims as ones for being convicted without even "some evidence" of guilt. *See* Dkt. 14, at 3–4. Lockett sought reconsideration of that decision, stating that he did not want to proceed under that theory; he wanted to proceed on a due process theory about the vagueness of the disciplinary regulations. *See* Dkt. 15. I dismissed the "some evidence" claim and granted Lockett leave to proceed on the lack-of-notice claim. Dkt. 18, at 1–2.

Defendants do go on to address the lack-of-notice claims, saying that they should be dismissed because Lockett failed to exhaust his administrative remedies and because his claims fail on the merits.

**1. Exhaustion**

Defendants have filed a motion for leave to raise an exhaustion defense later than the deadline set by the court in its preliminary pretrial conference order. Dkt. 33. I will grant that motion because there is no prejudice to Lockett; he has had a full chance to respond to defendants' exhaustion argument.

The Prison Litigation Reform Act requires inmates to exhaust all available administrative remedies before filing a lawsuit in federal court about prison conditions.

42 U.S.C. § 1997e(a). To comply with § 1997e(a), a prisoner must take each step in the administrative process, *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002), which includes following instructions for filing an initial grievance, *Cannon v. Washington*, 418 F.3d 714, 718 (7th Cir. 2005), as well as filing all necessary appeals, *Burrell v. Powers*, 431 F.3d 282, 284–85 (7th Cir. 2005), "in the place, and at the time, the prison's administrative rules require," *Pozo*, 286 F.3d at 1025. The purpose of these requirements is to give the prison administrators a fair opportunity to resolve the grievance without litigation. *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006). Failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense that must be proven by the defendant. *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).

Generally, to exhaust administrative remedies in Wisconsin, inmates must follow the Inmate Complaint Review System (ICRS) process set forth in Wisconsin Administrative Code Chapter DOC 310. But Lockett's claims are related to the conduct report he received. Under the Wisconsin Administrative Code, to complain about an issue related to a conduct report an inmate must raise the issue at the disciplinary hearing and again on appeal to the warden. *See* Wis. Admin. Code § DOC 303.82(1). The warden's decision is final with respect to sufficiency of the evidence, but alleged procedural deficiencies must then be pursued through the ICRS grievance system. Wis. Admin. Code § DOC 303.82(4).

Lockett argued in both his disciplinary hearing and his appeal that the regulations were too vague to give him notice that his conduct was prohibited. He didn't file an ICRS grievance on this issue afterward. The parties dispute whether the vagueness issue is a "procedural" question that could have been addressed in an ICRS grievance. I need not resolve this question

because Lockett submits a declaration stating that complaint examiner William Brown[5] explicitly told him that the vagueness issue was a substantive one about the validity of the conduct report, and that he needed to raise his substantive challenges only to the hearing officer and warden, within the disciplinary process. Defendants do not present evidence disputing this account. Courts have excused a prisoner's failure to complete the exhaustion process in circumstances in which prison officials or the applicable regulations provide unclear or confusing directions to prisoners. *See Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005) (prison officials that fail to "clearly identif[y]" the proper route for exhaustion cannot fault prisoner for failure to make the correct choice); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) ("Prison officials may not take unfair advantage of the exhaustion requirement . . . and a remedy becomes unavailable if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." (citation omitted)). Lockett persuasively shows here that even if he was required to file an ICRS grievance about the vagueness of the disciplinary regulations, complaint examiner William Brown misled him into thinking that he was not required to. Therefore, I will reject defendants' exhaustion argument.

## 2. Merits

Lockett's due process vagueness challenge to the disciplinary regulations "is grounded in the principles of fair warning or notice." *Koutnik v. Brown*, No. 04-C-911-C, 2005 WL 552192, at *2 (W.D. Wis. Mar. 2, 2005). In the prison context, regulations must be sufficiently definite to give prisoners of ordinary intelligence reasonable notice of what conduct is

---

[5] To avoid confusion with defendant Lebbeus Brown, I will refer to William Brown by his full name.

prohibited. *Rios v. Lane*, 812 F.2d 1032, 1038 (7th Cir. 1987) ("It is a fundamental precept of constitutional law . . . that a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process law."); *Toston v. Thurmer*, 689 F.3d 828, 832 (7th Cir. 2012) ("A deprivation of liberty without fair notice of the acts that would give rise to such a deprivation violates the due process clause[.]").

Lockett was convicted under two parts of Wis. Admin. Code §§ DOC 303.24, subsections (1) and (3); and under § DOC 303.47(2)(a). Section DOC 303.24 ("Group resistance and petitions") states as follows:

> An inmate who does any of the following is guilty of group resistance and petitions:
>
> (1) Participates in any group activity which is not approved by the warden or is contrary to provisions of this chapter.
>
> (2) Joins in or solicits another to join in any group petition or statement. The following activities are not prohibited:
>
>> (a) Authorized activity by groups approved by the warden.
>>
>> (b) Group petitions to the courts.
>>
>> (c) Complaints properly prepared under ch. DOC 310.
>
> (3) Participates in any activity associated with any security threat group or possesses any written materials, symbols or symbolism related to a security threat group.

Section DOC 303.47 ("Possession of contraband—miscellaneous") states in relevant part that inmates may not possess "[i]tems which are not allowed."

Of the three provisions that Lockett was convicted under, the parties spend the most time discussing § DOC 303.24(3), about "security threat group activity." That focus is understandable because it is clear that an inmate would know that he was violating § DOC

19

303.24(1) (unauthorized group activity) and § DOC 303.47 (possession of contraband) if he violated § DOC 303.24(3) by possessing gang materials.

So the key question is whether § DOC 303.24(3) is too vague. I note that the Court of Appeals for the Seventh Circuit has previously held that the similarly worded predecessor to § DOC 303.24(3) regarding security threat group activity was not unconstitutionally vague on its face. *Koutnik v. Brown*, 456 F.3d 777, 782–83 (7th Cir. 2006). But inmates have had some success challenging § DOC 303.24(3)'s predecessor as applied to their particular conduct. *See Toston*, 689 F.3d at 831–32 (gang-activity regulation didn't give fair warning that prisoner was forbidden from copying information from books that could be possessed in prison); *Jones v. Russell*, 149 F. Supp. 3d 1095, 1105 (W.D. Wis. 2015) (entering summary judgment in prisoner's favor on due process claim for being disciplined for preparing and sending an affidavit that prison staff called gang-related).

Lockett says that he and Prude were simply preparing a lawsuit about Growth and Development being barred in state prisons. (He says he was not aware of inmates Hayes and Tinnon's possession of the materials). He argues that he wasn't given fair notice that he could be punished for possessing materials for use in preparing his religious-discrimination case. He notes that § DOC 303.24(2)(b) explicitly allows "[g]roup petitions to the courts," and he cites *Jones* as an example of a court concluding that the DOC's gang-activity regulation violated the due process rights of a prisoner who was involved in litigation activities.

But *Jones* is distinguishable from the facts here. Jones was punished for sending another inmate a "gang related" affidavit for use in a state-court certiorari proceeding in an effort to undo that inmate's conviction for being a leader in the Gangster Disciples. *Jones*, 149 F. Supp. 3d at 1098–99. In the affidavit, Jones stated that he—a former high-ranking

20

member of the Gangster Disciples—"orchestrated a misinformation campaign intended to give prison officials the false impression that [the other inmate] was significantly involved in the Gangster Disciples." *Id.* at 1099. This court noted that the phrase "related to a security threat group" in the gang-activity regulation was so superficially broad that a reasonable prisoner would not expect prison officials to interpret it "literally and strictly"; a prisoner would be "undoubtedly justified in assuming that . . . there must be some types of ostensibly 'gang-related' documents that prisoners are allowed to possess." *Id.* at 1104. And prison procedures and policies gave no reason for Jones to think that he was forbidden from filing an affidavit about his own gang-related misdeeds in another inmate's litigation; to the contrary, the regulation allowed group petitions, which suggested that inmates would be allowed to file affidavits in others' cases; the prison had operated a mail route for prisoners to send each other legal documents and had other internal rules than authorized inmates to exchange legal documents; and Jones had previously been allowed to send a nearly identical affidavit. *Id.* at 1104–05. Perhaps most important, the underlying content of the affidavit in *Jones* may have literally been "gang-related" because it was one inmate's description of his prior misdeeds in tricking prison officials into believing that another inmate was part of the gang, but the affidavit did not contain information obviously harmful to prison security.

The materials at issue here, at least the *Blueprint of the New Concept,* are not merely incidentally "gang-related." If one agrees with the DOC's viewpoint of Growth and Development as a security threat group in its own right, the *Blueprint of the New Concept*—authored by a founder of the Gangster Disciples—is literally a blueprint for how to organize a prison gang, down to describing organizational hierarchies, governing principles and rules,

methods of discipline for members who break those rules, and including a membership application.

And unlike in *Jones*, there were no prison procedures condoning the type of behavior the prisoner was involved in, which might give an inmate reason to believe that his actions were allowed. To the contrary, Lockett admits that his idea for a lawsuit started because Growth and Development members were being punished for their religion: he knew that Growth and Development was not condoned by the DOC. As defendants point out, there are DOC procedures for requesting a new religious practice, which Lockett could have used to lobby DOC officials for acceptance of Growth and Development. But Lockett did not use those procedures. Instead he obtained materials for organizing a group that was already disallowed.

Lockett's argument that he was using the documents for preparing a group religious-discrimination lawsuit doesn't help him. I agree with defendants that "any reasonable person would understand that one cannot circumvent the prohibition on security threat group material by simply labeling it religious or legal." Dkt. 37, at 23. If the *Blueprint of the New Concept* were directly labeled as a how-to guide for Gangster Disciples instead of for Growth and Development, there would be no question that an inmate would expect to be punished for possessing the materials, even if they were attempting to use those documents in a lawsuit.

One similarity that this case shares with *Jones* is that Lockett initially went unpunished for the conduct he was later disciplined for: staff initially allowed Lockett to possess the materials, only later punishing him for them. But this minor similarity with *Jones* doesn't change the fact that the materials at issue here are much more clearly the types of communications that the security-threat-group regulation is meant to cover. And I am aware of no authority suggesting that prison officials render a disciplinary regulation unconstitutionally vague by

changing their minds about whether an item is contraband; no regulation will ever be enforced with compete precision, and staff will sometimes let through materials that are later determined to be contraband.

Lockett also says that Brown suggested that he could list Growth and Development on his religious preference form and that he could have Growth and Development materials "advocat[ing] positivity." But as with Lockett's retaliation claims, Lockett's due process claim isn't satisfied merely by Brown giving him affirmative answers to broad questions about what he could do or what he could own. And in any event, officials disciplined Lockett after circumstances changed—an investigation showed that multiple Growth and Development inmates were sending for copies of the materials and sharing them with each other, which gave them additional reason to believe that Lockett was involved in gang activity.

Lockett says that Growth and Development isn't actually a security threat group, but whether he is objectively correct about that is irrelevant to the notice issue—Lockett already knew that Growth and Development was not an approved group in DOC prisons. Defendants say that they believe Growth and Development is a front for the Gangster Disciples, and the evidence they provide in support of that, including the *Blueprint of the New Concept* itself, plausibly supports that belief. In any event, the court generally defers to prison officials on matters of prison security. *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989)) ("Courts must "afford[] considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *see also Koutnik*, 456 F.3d at 785 (deferring to prison staff's assessment regarding gang symbols). Lockett's arguments about the correctness of the disciplinary decision are ones he could have raised in his appeal and then in certiorari proceedings in state court; this court is not the proper

place to challenge whether state officials properly interpreted their regulations. *See State ex rel. Meeks v. Gagnon*, 95 Wis. 2d 115, 119–20, 289 N.W.2d 357 (Ct. App. 1980) (prisoner can challenge disciplinary decision by writ of certiorari).

Because I conclude that the disciplinary regulations at issue here are not unconstitutionally vague as applied to Lockett's conduct, I will grant defendants' motion for summary judgment on Lockett's due process claims and I will deny Lockett's motion for summary judgment on those claims.[6]

Defendants have filed a motion to stay pretrial submission deadlines pending a ruling on the parties' summary judgment motions. Dkt. 52. Because this order results in the dismissal of all of Lockett's claims, I will deny that motion as moot.

---

[6] Defendants also contend that they are entitled to qualified immunity on Lockett's claims. Because I am dismissing Lockett's claims on the merits, I need not consider defendants' qualified immunity arguments.

ORDER

IT IS ORDERED that:

1. Defendants' motion for leave to raise an exhaustion defense, Dkt. 33, is GRANTED.

2. Plaintiff Jeremy Lockett's motion for summary judgment, Dkt. 26, is DENIED.

3. Defendants' motion for summary judgment, Dkt. 36, is GRANTED.

4. Defendants' motion to stay pretrial submission deadlines, Dkt. 52, is DENIED as moot.

5. The clerk of court is directed to enter judgment accordingly and close the case.

Entered January 25, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge